# HUGHES, SECRETARY OF TRANSPORTATION OF MARYLAND, ET AL. *v.* ALEXANDRIA SCRAP CORP.

No. 74–1607.   Argued January 21, 1976—Decided June 24, 1976

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 814. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 817.

*Henry R. Lord,* Deputy Attorney General of Maryland, argued the cause for appellants. With him on the briefs were *Francis B. Burch,* Attorney General, and *J. Michael McWilliams* and *Glenn E. Bushel,* Assistant Attorneys General.

*Norman P. Ramsey* argued the cause for appellee.

With him on the brief were *H. Thomas Howell* and *Alan N. Gamse.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case involves a two-pronged constitutional attack on a recent amendment to one part of a complex Maryland plan for ridding that State of abandoned automobiles. The three-judge District Court agreed with appellee, a Virginia scrap processor that participates in the plan, that the amendment violated the Commerce Clause and denied appellee equal protection of the laws. We disagree on both points.

I

The 1967 session of the Maryland Legislature commissioned a study to suggest some way to deal with the growing aesthetic problem of abandoned automobiles. The study concluded that the root of the problem was the existence of bottlenecks in the "scrap cycle," the course that a vehicle follows from abandonment to processing into scrap metal for ultimate re-use by steel mills. At its 1969 session, the legislature responded by enacting a comprehensive statute designed to speed up the scrap cycle by using state money both as a carrot and as a stick.[1] The statute is intricate, but its provisions relevant to this case may be sketched briefly.

The legislative study had found that one of the bottlenecks occurred in the junkyards of wrecking companies, which tended to accumulate vehicles for the resale value of their spare parts. The statute's stick designed to clear this bottleneck is a requirement that a Maryland wrecker

---

[1] 1969 Md. Laws, c. 556. The law, as amended, is codified at Md. Ann. Code, Art. 66½, § 5-201 *et seq.* (1970 ed. and Supp. 1975).

desiring to keep abandoned vehicles on its premises must obtain a license and pay a recurring fine for any vehicle of a specified age retained for more than a year.[2] The study had identified as another cause of sluggishness in the scrap cycle the low profits earned by wreckers and others for delivering vehicles to scrap processors. The carrot written into the statute to remedy this problem is a "bounty" paid by the State for the destruction, by a processor licensed under the statute, of any vehicle formerly titled in Maryland.[3] When a wrecker licensed under the statute to stockpile vehicles delivers one of them for scrapping it shares the bounty equally with the processor. The processor receives the entire bounty when it destroys a vehicle supplied by someone other than a licensed wrecker.[4]

These penalty and bounty provisions work with elementary laws of economics to speed up the scrap cycle. The penalty for retention of vehicles, plus the prospect of sharing the bounty, work in tandem to encourage licensed wreckers to move vehicles to processors. The bounties to processors on vehicles from unlicensed suppliers also encourage those suppliers to deliver to the processors, because the processors are able to pay higher than normal market prices by sharing the bounties with them.[5]

---

[2] Md. Ann. Code, Art. 66½, §§ 5–202, 5–203 (d) (Supp. 1975).

[3] Md. Ann. Code, Art. 66½, § 5–205 (Supp. 1975).

[4] In addition to receiving vehicles from licensed wreckers, processors receive them from the owners of the vehicles themselves and, more frequently, from unlicensed wreckers who tow an abandoned or wrecked vehicle directly to a processor rather than retaining it for its spare-part value.

[5] The bounty started at $10 per vehicle and moved up to $16 by the time of this suit. As noted in the text, *supra,* a licensed wrecker receives half of this sum directly from the State. A profit margin for unlicensed suppliers is assured by the willingness of processors, who need a fairly constant supply of hulks to run their

The penalty and bounty provisions, however, did not remove another impediment to the smooth functioning of the scrap cycle that was legal rather than economic in origin. This was the possibility of suits for conversion against a processor by owners who might claim that they had not abandoned their vehicles. To meet this problem the statute specified several documents with which a processor could prove clear title to a vehicle, and required that a processor obtain one of these documents from its supplier and submit it to the State as a condition of receiving the bounty. One of the documents, called a "Wrecker's Certificate," can be given only by a wrecker licensed under the statute.[6] It is essentially a clear title that the wrecker secures by following statutory notice procedures at the time it first obtains a vehicle. Suppliers other than licensed wreckers must provide some other document—either a properly endorsed certificate of title, a certificate from a police department vesting title in the supplier after statutory notices, or a bill of sale from a police auction.[7]

These documentation requirements, although vital for the protection of processors, are themselves some slight encumbrance upon the free transfer of abandoned vehicles to processors. Apparently in recognition of this fact, and the reduced potential for owners' claims in the case of ancient automobiles, the statute placed vehicles over eight years old and inoperable ("hulks") into a special category. Section 11–1002.2 (f) (5) of the stat-

---

expensive machinery efficiently, to "rebate" most of the bounty. Appellee, for example, regularly pays $14 of the current $16 bounty to its unlicensed suppliers.

[6] Md. Ann. Code, Art. 66½, § 5–203 (b), (c) (1970 ed. and Supp. 1975).

[7] Md. Ann. Code, Art. 66½, §§ 5–203.1, 11–1002.2 (f) (1–4), 11–1002.2 (a–d) (1970 ed. and Supp. 1975).

ute, as originally enacted, provided in substance that anyone in possession of a hulk could transfer it to a scrap processor, and the processor could claim a bounty for its destruction, without delivery to the processor or subsequent submission to the State of *any* documentation of title.[8]

## A

The statute extends its burdens of fines, and its benefits in the form of a share in bounties, only to wreckers that maintain junkyards located in Maryland, and requires a license only of those wreckers. There is no similar residency requirement for scrap processors that wish to obtain a license and participate in the bounty program,[9] and in fact seven of the 16 scrap processors that have participated are located in either Pennsylvania or Virginia. Appellee, a Virginia corporation with a processing plant near the Potomac River in Alexandria, was an original licensee under the Maryland statute. Presumably because of its proximity to the southern Maryland

---

[8] Maryland Ann. Code, Art. 66½, § 11–1002.2 (f) (5) (1970), as originally enacted, read as follows:

"Notwithstanding any other provisions of this section, any person, firm, corporation, or unit of government upon whose property or in whose possession any *abandoned* motor vehicle is found, or any person being the owner of a motor vehicle whose title certificate is faulty, or destroyed, may dispose of the motor vehicle to a wrecker or scrap processor *without the title and without notification procedures* of subsection (c) [subsections (a) and (b)] of this section, *if the motor vehicle is over eight years old and has no engine or is otherwise totally inoperable.*" (Emphasis supplied.)

[9] A participating processor must meet statutory requirements relating to its storage area for vehicles, its records and books of account, and its processing equipment. Md. Ann. Code, Art. 66½, § 5–202 (Supp. 1975). An administrative regulation promulgated pursuant to the statute requires that a licensed non-Maryland processor maintain an "office" within the State approved by the State Motor Vehicle Administration. Md. A. R. R. § 11.02.05.45.

and Washington, D. C., areas, appellee attracted enough Maryland-titled vehicles to its plant to rank third among licensed processors in receipt of bounties through the summer of 1974.

As is apparently the case with most of the licensed processors, virtually all (96%) of the bounty-eligible vehicles processed by appellee during that period were hulks, upon which appellee did not have to demand title documentation from its suppliers in order later to receive the bounty. In the summer of 1974, however, Maryland changed significantly the treatment of hulks by amending § 11–1002.2 (f)(5).[10] Under the law as amended it is no longer possible for a licensed scrap processor to receive a bounty on a hulk without submitting title documentation to the State. But the documentation required of a processor whose plant is in Maryland differs from that required of a processor, like appellee, whose plant

[10] 1974 Md. Laws, c. 465. The amendment did not change the wording of the original section, n. 8, *supra*, but added the following language:

"In those cases only, a scrap processor whose plant is physically located and operating in this State shall execute an indemnity agreement that shall be filed with the Motor Vehicle Administration. The indemnity agreement shall contain the name, address and signature of the person delivering the vehicle. The indemnity agreement and the manufacturer's serial or identification number shall be satisfactory proof that the vehicle has been destroyed and shall be acceptable for payment of the full bounty authorized by section 5–205 if the vehicle identified in the indemnity agreement was titled in this State. Otherwise, for the purpose of administering the provisions of this section, the provisions of section 5–205 shall not apply."

Section 5–205, mentioned in the amendment, is the only statutory provision authorizing bounty payments. See *supra*, at 797. Without the benefit of § 11–1002.2 (f)(5) following the 1974 amendment, out-of-state processors must depend upon other sections that authorize a § 5–205 bounty only upon more elaborate title documentation. See *supra*, at 798.

is not in Maryland. The former need only submit a simple document in which the person who delivered the hulk certified his own right to it and agreed to indemnify the processor for any third-party claims arising from its destruction. Hulk processors long had required such "indemnity agreements" from their hulk suppliers as a matter of industry practice. The effect of the 1974 amendment is to give these agreements legal recognition and to require one when a Maryland processor applies for a bounty on a hulk. The non-Maryland processor, however, cannot submit a simple indemnity agreement. For it, receipt of a bounty on a hulk now depends upon the same documentation specified for abandoned vehicles in general: a certificate of title, a police certificate vesting title, a bill of sale from a police auction, or—in the case of licensed wreckers only—a Wrecker's Certificate.

## B

The complaint in this case was filed shortly after the effective date of the amendment to § 11–1002.2 (f)(5). Papers submitted to the three-judge District Court on summary judgment indicated that enactment of the amendment had been followed by a precipitate decline in the number of bounty-eligible hulks supplied to appellee's plant from Maryland sources.[11] Appellee attributed the decline primarily to the effect of the amendment upon the decision of unlicensed suppliers as to where to

---

[11] Appellee submitted an affidavit of its general manager containing statistics that showed the decline. During the six-month period immediately preceding the effective date of the amendment, appellee received 14,253 hulks from Maryland sources. In the six months immediately thereafter, the total was 9,723. This marked a decline of 31.8% in the number of bounty-eligible hulks, at a time when appellee's figures showed an *increase* of 11.9% in the number of vehicles supplied from non-Maryland sources.

dispose of their hulks.[12]   It is easier for an unlicensed supplier to sign an indemnity agreement upon delivering a hulk to a processor than it is for it to secure some form of title documentation.   Because only a Maryland processor can use an indemnity agreement to obtain a bounty, the amendment gave Maryland processors an advantage over appellee and other non-Maryland processors in the competition for bounty-eligible hulks from unlicensed suppliers.   Such hulks therefore now tend to remain in State instead of moving to licensed processors outside Maryland.

Appellee contended below that the 1974 amendment to § 11–1002.2 (f) (5) violated the Commerce Clause by interfering with, or "burdening," the flow of bounty-eligible hulks across state lines, and denied appellee equal protection of the laws by discriminating arbitrarily between it and licensed processors located in Maryland as to the right to claim bounties on hulks by submitting indemnity agreements.   The District Court granted summary judgment to appellee on both claims, and enjoined the State of Maryland from giving further effect to that part of the 1974 amendment which restricts the right to obtain bounties based on indemnity agreements to Maryland processors only.   391 F. Supp. 46.   The State appealed, and we noted probable jurisdiction.   423 U. S. 819.

## II

In this Court appellee relies on the Commerce Clause

---

[12] Appellee's figures showed that the number of hulks delivered by licensed wreckers, which before and after the amendment tended to use Wrecker's Certificates almost exclusively, more than doubled in the six months following the amendment (from 1,934 vehicles in the preceding six months to a total of 4,161 vehicles).   The number of hulks delivered by unlicensed suppliers, however, plummeted by 54.9%, from 12,319 during the six months before the amendment to 5,561 in the comparable period thereafter.

argument that was adopted by the District Court. The argument starts from the premise, well established by the history of the Commerce Clause, that this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods in response to the economic laws of supply and demand. See *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 370–371 (1976). Appellee concedes that until the 1974 amendment the Maryland system operated in conformity with the common-market principle. There was free competition among licensed processors for Maryland hulks from unlicensed suppliers and an unimpeded flow of such hulks out of Maryland to appellee and other non-Maryland processors. The only effect of the bounty was to enhance the value of hulks and thus make it more likely that they would be moved to processing plants.

The practical effect of the amendment, however, was to limit the enhanced price available to unlicensed suppliers to hulks that stayed inside Maryland, thus discouraging such suppliers from taking their hulks out of State for processing. The result was that the movement of hulks in interstate commerce was reduced.[13] Appellee

---

[13] The amendment did not accomplish this effect directly. After the amendment it still was possible for licensed non-Maryland processors to receive bounty-eligible hulks from unlicensed Maryland suppliers. But because it was significantly easier for those suppliers to obtain an enhanced price from Maryland processors, they tended to deliver inside the State. The practical effect was substantially the same as if Maryland had withdrawn altogether the availability of bounties on hulks delivered by unlicensed suppliers to licensed non-Maryland processors. Indeed, this is the way appellee characterized the operation of the amendment:

"Old and inoperable hulks continued to fetch an 'artifically enhanced value' for their suppliers, but only if delivered intrastate to 'a scrap processor whose plant is physically located and operating' in Maryland. Old and inoperable hulks exported for processing in contiguous states were ineligible for bounty and sold at much

contends that this effect of the 1974 amendment is a "burden" on interstate commerce, the permissibility of which must be determined under the test of *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). The Court there stated that "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." See also *Great A&P Tea Co.* v. *Cottrell, supra,* at 371–372.

The District Court accepted appellee's analysis, and concluded that the 1974 amendment failed the *Pike* test. First, the court found that the amendment did impose "substantial burdens upon the free flow of interstate commerce." 391 F. Supp., at 62. Moreover, it considered the disadvantage suffered by out-of-state processors to be particularly suspect under previous decisions of this Court, noting that to avoid the disadvantage those processors would have to build new plants inside Maryland to carry on a business which, prior to the amendment, they had pursued efficiently outside the State. See *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928); *Pike* v. *Bruce Church, Inc., supra,* at 145. Maryland's principal argument in support of the amendment was that, by making it difficult for out-of-state processors to claim bounties on hulks delivered by unlicensed suppliers, the amendment tends to reduce the amount of state funds paid for destruction of Maryland-titled hulks abandoned in the States where those processors are

lower prices prevailing on the free market for scrap metal. For towing services and other unlicensed suppliers, in business for profit and attracted by high prices, transactions with licensed processors beyond Maryland's borders now entailed financial sacrifice. Accordingly, their hulks were withdrawn from interstate commerce and delivered for processing within Maryland for the bounty-generated rebates which only Maryland-based processors could provide." Brief for Appellee 34.

located instead of in Maryland. The District Court acknowledged the validity of this interest, but considered the means employed inappropriate under *Pike* because the same interest could have been furthered, with less impact upon interstate commerce, by amending the statute to condition the bounty upon a hulk's abandonment in Maryland instead of its previous titling there.[14]

This line of reasoning is not without force if its basic premise is accepted. That premise is that every action by a State that has the effect of reducing in some manner the flow of goods in interstate commerce is potentially an impermissible burden. But we are not persuaded that Maryland's action in amending its statute was the kind of action with which the Commerce Clause is concerned.

The situation presented by this statute and the 1974 amendment is quite unlike that found in the cases upon which appellee relies. In the most recent of those cases, *Pike* v. *Bruce Church, supra,* a burden was found to be imposed by an Arizona requirement that fresh fruit grown in the State be packed there before shipment interstate. The requirement prohibited the interstate shipment of fruit in bulk, no matter what the market demand for such shipments. In *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525 (1949), a New York official denied a license to a milk distributor who wanted to open a new plant at which to receive raw milk from New York farmers for immediate shipment to Boston. The denial blocked a potential increase in the interstate movement of raw milk. Appellee also relies upon *Toomer* v. *Witsell,* 334 U. S. 385 (1948), in which this Court found interstate commerce in raw shrimp to be burdened by a South Carolina requirement that shrimp boats fishing off its coast dock in South Carolina and pack and pay taxes on their catches before trans-

---

[14] Cf. *infra,* Part III.

porting them interstate. The requirement increased the cost of shipping such shrimp interstate. In *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928), a Louisiana statute forbade export of Louisiana shrimp until they had been shelled and beheaded, thus impeding the natural flow of freshly caught shrimp to canners in other States. Both *Shafer* v. *Farmers Grain Co.*, 268 U. S. 189 (1925), and *Lemke* v. *Farmers Grain Co.*, 258 U. S. 50 (1922), involved efforts by North Dakota to regulate and thus disrupt the interstate market in grain by imposing burdensome regulations upon and controlling the profit margin of corporations that purchased grain in State for shipment and sale outside the State. And in *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), the Court found a burden upon the established interstate commerce in natural gas when a new West Virginia statute required domestic producers to supply all domestic needs before piping the surplus, if any, to other States.

The common thread of all these cases is that the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation. By contrast, Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead, it has entered into the market itself to bid up their price. There has been an impact upon the interstate flow of hulks only because, since the 1974 amendment, Maryland effectively has made it more lucrative for unlicensed suppliers to dispose of their hulks in Maryland rather than take them outside the State.[15]

---

[15] Again, we emphasize that the 1974 amendment, by its terms, does not *require* unlicensed suppliers to deliver hulks in State to receive enhanced prices. This is simply its effect in practice, and this is the way appellee itself views the amendment as operating. See n. 13, *supra*. To whatever extent unlicensed suppliers still take

Appellee recognizes that the situation presented by this case is without precedent in this Court. It argues that the 1974 amendment nevertheless must be subjected to the same scrutiny as the state actions in earlier cases, because "[w]hat is controlling . . . is not the means by which Maryland has chosen to discriminate, but the practical effect of that discrimination upon interstate commerce." Brief for Appellee 63. In short, appellee urges that the alleged burden upon interstate commerce from the 1974 amendment "is not immunized by its novelty." *Ibid.*

We believe, however, that the novelty of this case is not its presentation of a new form of "burden" upon commerce, but that appellee should characterize Maryland's action as a burden which the Commerce Clause was intended to make suspect. The Clause was designed in part to prevent trade barriers that had undermined efforts of the fledgling States to form a cohesive whole following their victory in the Revolution.[16] This

---

hulks from Maryland to appellee and other non-Maryland processors, of course, there has been no interruption of interstate commerce.

[16] "It was . . . to secure freedom of trade, to break down the barriers to its free flow, that the Annapolis Convention was called, only to adjourn with a view to Philadelphia. Thus the generating source of the Constitution lay in the rising volume of restraints upon commerce which the Confederation could not check. They were the proximate cause of our national existence down to today.

"As evils are wont to do, they dictated the character and scope of their own remedy. This lay specifically in the commerce clause. No prohibition of trade barriers as among the states could have been effective of its own force or by trade agreements. . . . Power adequate to make and enforce the prohibition was required. Hence, the necessity for creating an entirely new scheme of government." W. Rutledge, A Declaration of Legal Faith 25–26 (1947). See *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, 533–535 (1949).

aspect of the Clause's purpose was eloquently expressed by Mr. Justice Jackson:

> "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality. . . ." *H. P. Hood & Sons* v. *Du Mond, supra,* at 539.

In realizing the Founders' vision this Court has adhered strictly to the principle "that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it." *Id.,* at 535.[17] But until today the Court has not been asked to hold that the entry by the State itself into the market as a purchaser, in effect, of a potential article of interstate commerce creates a burden upon that commerce if the State restricts its trade to its own citizens or businesses within the State.

---

[17] The cases upon which appellee primarily relies, and which are discussed in the text, *supra,* at 805–806, illustrate that this principle makes suspect any attempt by a State to restrict or regulate the flow of commerce out of the State. The same principle, of course, makes equally suspect a State's similar effort to block or to regulate the flow of commerce into the State. See, *e. g., Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511 (1935); *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951); *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361 (1964). See generally *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366 (1976).

We do not believe the Commerce Clause was intended to require independent justification for such action. Maryland entered the market for the purpose, agreed by all to be commendable as well as legitimate, of protecting the State's environment. As the means of furthering this purpose, it elected the payment of state funds—in the form of bounties—to encourage the removal of automobile hulks from Maryland streets and junkyards. It is true that the state money initially was made available to licensed out-of-state processors as well as those located within Maryland, and not until the 1974 amendment was the financial benefit channeled, in practical effect, to domestic processors. But this chronology does not distinguish the case, for Commerce Clause purposes, from one in which a State offered bounties only to domestic processors from the start.[18] Regardless of when the State's largesse is first confined to domestic processors, the effect upon the flow of hulks resting within the State is the same: they will tend to be processed inside the State rather than flowing to foreign processors. But no

---

[18] We note that the commerce affected by the 1974 amendment appears to have been created, in whole or in substantial part, by the Maryland bounty scheme. We would hesitate to hold that the Commerce Clause forbids state action reducing or eliminating a flow of commerce dependent for its existence upon state subsidy instead of private market forces. Because the record contains no details of the hulk market prior to the bounty scheme, however, this issue is not clearly presented.

We also note that appellee undertook to build no new plant nor add additional machinery in reliance upon the prospect of receiving additional hulks under the Maryland bounty scheme. Instead, appellee stipulated in the District Court that participation in the program has caused no alteration in its method of operation. We intimate no view as to the consequences, if any, in a Commerce Clause case of a different state of facts in this respect. Cf. *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 587 (1923); F. Ribble, State and National Power over Commerce 219 (1937).

trade barrier of the type forbidden by the Commerce Clause, and involved in previous cases, impedes their movement out of State. They remain within Maryland in response to market forces, including that exerted by money from the State. Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action,[19] from participating in the market and exercising the right to favor its own citizens over others.[20]

## III

The District Court also found the 1974 amendment to be violative of the Equal Protection Clause.[21] Appellee

---

[19] Our reference to the absence of congressional action implies no view on whether Congress could prohibit the type of selective participation in the market undertaken by Maryland. It is intended only to emphasize that this case involves solely the restrictions upon state power imposed by the Commerce Clause when Congress is silent.

[20] Appellee and the other licensed non-Maryland processors are free to withdraw from the bounty program should they decide that the benefits they receive from it after the 1974 amendment do not justify the annual license fee. They are not in the position of a foreign business which enters a State in response to completely private market forces to compete with domestic businesses, only to find itself burdened with discriminatory taxes or regulations. See, e. g., Best & Co. v. Maxwell, 311 U. S. 454 (1940); Nippert v. Richmond, 327 U. S. 416 (1946); Memphis Steam Laundry v. Stone, 342 U. S. 389 (1952); West Point Grocery v. Opelika, 354 U. S. 390 (1957); Halliburton Oil Well Co. v. Reily, 373 U. S. 64 (1963).

[21] Maryland argued in this Court that appellee, a Virginia corporation, cannot claim the protection of the Fourteenth Amendment, which prohibits a State's denial of equal protection to persons "within its jurisdiction." Maryland relies upon Blake v. McClung, 172 U. S. 239 (1898), where a Virginia corporation was held unprotected by the Equal Protection Clause against a Tennessee statute that subordinated its claims as a creditor to those of Tennessee corporations. But the situation here differs significantly from McClung. The Court in that case noted that the Virginia corporation was not

supports this holding by contending that no difference between the operations of foreign and domestic processors justifies denying to the former the right to use indemnity agreements, and that this discriminatory denial furthers no legitimate state purpose. Maryland, having licensed out-of-state processors, does not justify the amendment's distinction on the basis of any difference in the manner of operation. But Maryland does insist that several state interests are served by it. We agree with Maryland with respect to its primary justification for the 1974 amendment, and thus find it unnecessary to consider other interests that also may be furthered.

Maryland argues that the distinction between domestic and foreign processors in the 1974 amendment is related to the basic statutory purpose of clearing Maryland's landscape of abandoned automobiles. Underlying this argument are the complementary assumptions that hulks delivered to Maryland processors are likely to have been abandoned in Maryland, and those delivered to non-Maryland processors are likely to have been abandoned outside Maryland. Based upon those assumptions, the

---

"doing business in Tennessee under the statute here involved, or under any statute that would bring it directly under the jurisdiction of the courts of Tennessee by service of process on its officers or agents." *Id.*, at 261. Appellee, however, paid a fee to become licensed under Maryland law, maintains an office in Maryland as required by Maryland regulation, and has been found by the District Court to be subject to the jurisdiction of Maryland courts under the State's "long arm" statute. Although appellee carries on no active business inside Maryland (all vehicles are brought by others to its plant in Virginia), it is "within [Maryland's] jurisdiction" at least for the purposes of this licensing and bounty program. We think this entitles appellee to claim Fourteenth Amendment protection with respect to that program. Cf. *WHYY* v. *Glassboro*, 393 U. S. 117, 119 (1968); *Wheeling Steel Corp.* v. *Glander*, 337 U. S. 562, 571–572 (1949).

State contends that the 1974 amendment, by making it easy for an in-state processor to receive bounties but difficult for an out-of-state processor to do so, tends to ensure that the State's limited resources are targeted to hulks abandoned inside Maryland as opposed to some contiguous State.

The District Court rejected this argument with the observation that Maryland had "not proffered a scintilla of factual support for [its] assumption that nonresident processors are more likely than in-state processors to claim bounties for vehicles abandoned outside of Maryland." 391 F. Supp., at 57. The District Court demanded too much. Maryland's underlying assumptions certainly are not irrational: in terms of likelihood, the Maryland Legislature reasonably could assume that a hulk destroyed by a non-Maryland processor is more likely to have been abandoned outside Maryland than is a hulk destroyed by a Maryland processor, and vice versa. The State is not compelled to verify logical assumptions with statistical evidence.[22]

Appellee contends that the alleged relationship of the amendment to the statutory purpose is belied by a "loophole" in the statute that remains even after the amendment. This "loophole" results from the fact that the statute conditions the payment of bounty upon previous titling of a vehicle in Maryland, rather than upon proof of its abandonment in that State. Thus, even after the 1974 amendment an in-state processor remains free to

---

[22] As noted earlier, n. 12, *supra*, licensed wreckers use primarily Wrecker's Certificates when delivering hulks to processors. The 1974 amendment did not affect the ability of foreign processors to claim bounties on an equal footing with domestic processors by submitting such certificates. That was consistent with Maryland's effort to reduce the amount of bounty payments for hulks that had rested in some other State: since all licensed wreckers are inside Maryland, see supra, at 796–797, 799, hulks delivered with certificates always will have been eyesores in Maryland junkyards.

recover bounties on hulks previously titled in Maryland but delivered to it after abandonment elsewhere. A more discriminating effort to achieve the statutory purposes, according to appellee, would have changed the statute to condition the bounty upon proof of abandonment in Maryland.[23]

It is well established, however, that a statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955). That Maryland might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional. See *Katzenbach* v. *Morgan,* 384 U. S. 641, 657 (1966).

Moreover, the statute in its present form still allows payment of bounty on a hulk to a non-Maryland processor upon proper documentation of title. The logic in support of the 1974 amendment—that Maryland processors are more likely than out-of-state processors to

[23] In fact, appellee argues that the statute as it now stands, conditioning payment of bounties only upon previous Maryland titling, manifests no policy to restrict the payment of bounties to vehicles abandoned in Maryland. This comes close to an argument that this intricate statutory scheme was instituted not for the purpose of clearing Maryland's environment of abandoned vehicles, but for the purpose of destroying Maryland titled hulks wherever they might be found—even if it happened to be Virginia or Pennsylvania. Appellee's argument is especially unpersuasive in light of the legislative history of this statute which appellee itself discussed in its brief. That history shows beyond question Maryland's purpose to use the bounty to clear its own streets, lots, and junkyards of abandoned vehicles. That the bounty is conditioned upon previous Maryland titling, rather than proof of abandonment in Maryland, is probably a decision made in the interest of administrative convenience. Determining the place of abandonment would present problems of proof as well as invite fraudulent claims.

destroy hulks abandoned inside the State—suggests the rationality of Maryland's discontinuing bounties to out-of-state processors altogether. If Maryland could do that, we are not prepared to say that it is forbidden to go part of the way by an amendment that has the practical effect, through the distinction as to documentation of title, of substantially curtailing bounty payments to out-of-state processors.[24]

Few would contend that Maryland has taken the straightest road to its goal, either in its original drafting of the statute or in the refinement introduced by the 1974 amendment. But in the area in which this bounty scheme operates the Equal Protection Clause does not demand a surveyor's precision. The 1974 amendment bears a rational relationship to Maryland's purpose of using its limited funds to clean up its own environment, and that is all the Constitution requires. See *Dandridge* v. *Williams,* 397 U. S. 471, 486–487 (1970); *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 44 (1973); *McGinnis* v. *Royster,* 410 U. S. 263, 270, 276-277 (1973).

We hold that the District Court erred in finding the 1974 amendment invalid under either the Commerce Clause or the Equal Protection Clause. Accordingly, its judgment is reversed.

*So ordered.*

MR. JUSTICE STEVENS, concurring.

The dissent creates the impression that the Court's opinion, which I join without reservation, represents a significant retreat from its settled practice in adjudicat-

---

[24] It is worth emphasizing that appellee and other out-of-state processors are subject to Maryland licensing, with its annual fee requirements and other nominal burdens, only if they choose to participate in the bounty. If they feel their benefits from such participation after the 1974 amendment do not merit the expense, they are free to withdraw entirely.

ing claims that a state program places an unconstitutional burden on interstate commerce. This is not the fact. There is no prior decision of this Court even addressing the critical Commerce Clause issue presented by this case.

It is important to differentiate between commerce which flourishes in a free market and commerce which owes its existence to a state subsidy program. Our cases finding that a state regulation constitutes an impermissible burden on interstate commerce all dealt with restrictions that adversely affected the operation of a free market. This case is unique because the commerce which Maryland has "burdened" is commerce which would not exist if Maryland had not decided to subsidize a portion of the automobile scrap-processing business.

By artificially enhancing the value of certain abandoned hulks, Maryland created a market that did not previously exist.* The program which Maryland initiated in 1969 included subsidies for scrapping plants located in Virginia and Pennsylvania as well as for plants located in Maryland. Those subsidies stimulated the movement of abandoned hulks from Maryland to out-of-state scrapping plants and thereby gave rise to the interstate commerce which is at stake in this litigation.

That commerce, which is now said to be burdened, would never have existed if in the first instance Maryland had decided to confine its subsidy to operators of Maryland plants. A failure to create that commerce would have been unobjectionable because the Commerce Clause surely does not impose on the States any obliga-

---

*It might be more accurate to state that Maryland substantially enlarged the market that was previously too small to be significant. But the analysis is the same whether we are dealing with the newly created portion of a pre-existing market or with an entirely new market.

tion to subsidize out-of-state business. Nor, in my judgment, does that Clause inhibit a State's power to experiment with different methods of encouraging local industry. Whether the encouragement takes the form of a cash subsidy, a tax credit, or a special privilege intended to attract investment capital, it should not be characterized as a "burden" on commerce. Accordingly, the program in effect in Maryland since 1974 could hardly have been challenged if it had been adopted in 1969.

Since Maryland did subsidize Virginia and Pennsylvania plants from 1969 to 1974, it is easy to describe the elimination of the out-of-state subsidy as a burden on interstate commerce. Indeed, we may assume that the temporarily subsidized interstate business has now been totally eliminated. It does not follow, however, that such a "burden" is impermissible.

Unquestionably Maryland could terminate its entire program, discontinuing subsidy payments to Maryland operators as well as out-of-state firms, without offending the Constitution. Since, by hypothesis, we are dealing with a business that is dependent on the availability of subsidy payments, such a complete termination of Maryland's program would have precisely the same effect on the out-of-state plants as the partial termination effected in 1974. The "burden" on the Virginia processor is caused by the nonreceipt of the subsidy, regardless of whether or not Maryland elects to continue to subsidize its local plants. It follows, I believe, that the constitutional issue presented by the 1974 amendment is the same as the question which would have arisen if Maryland had never made the subsidy available to out-of-state concerns.

This is the first case in which any litigant has asked a federal court to address the question whether a state

subsidy constitutes a "burden" on interstate commerce. That fact is significant because there must have been countless situations during the past two centuries in which the several States have experimented with different methods of encouraging local enterprise without providing like encouragement to out-of-state competitors. The absence of any previous challenge to such programs reflects, I believe, a common and correct interpretation of the Commerce Clause as primarily intended (at least when Congress has not spoken) to inhibit the several States' power to create restrictions on the free flow of goods within the national market, rather than to provide the basis for questioning a State's right to experiment with different incentives to business. The District Court's novel interpretation of the "burden" concept represented a departure which, had it been accepted, would impair rather than protect interstate commerce.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

The Court continues its reinterpretation of the Commerce Clause and its repudiation of established principles guiding judicial analysis thereunder—in this case shifting its focus from congressional power arising under the Commerce Clause, see *National League of Cities* v. *Usery, post,* p. 833, to the role of this Court in considering the constitutionality of state action claimed impermissibly to burden interstate commerce. Principles of legal analysis heretofore employed in our cases considering claims under the Commerce Clause, *e. g., South Carolina Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S. 177 (1938); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761 (1945); *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525 (1949); *Bibb* v. *Navajo Freight Lines,* 359 U. S. 520

(1959); *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970); *Great A&P Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976), are ignored,[1] and an area of state action plainly burdening interstate commerce, an area not easily susceptible of principled limitation, is judicially carved out and summarily labeled as not "the kind of action with which the Commerce Clause is concerned." Ante, at 805. I cannot agree that well-established principles for analyzing claims arising under the Commerce Clause are inapplicable merely because of the "kind of [state] action" involved, or that it is defensible that legal analysis should cease, irrespective of the impact on commerce or the other facts and circumstances of the case, merely because the Court somehow categorically determines that the instant case involves "a burden which the Commerce Clause was [not] intended to make suspect." *Ante,* at 807.[2] In my view, "[e]very case determining whether or not a local regulation amounts to a prohibited 'burden' on interstate commerce belongs at some point along a graduated scale." *H. P. Hood & Sons, Inc.* v. *Du Mond, supra,* at 568 n. 2 (Frankfurter, J., dissenting). Therefore, I am "constrained to dissent because I cannot agree

---

[1] "For a hundred years it has been accepted constitutional doctrine that the commerce clause, without the aid of Congressional legislation, . . . affords some protection from state legislation inimical to the national commerce, and that in such cases, where Congress has not acted, this Court, and not the state legislature, is under the commerce clause the final arbiter of the competing demands of state and national interests." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 769 (1945).

[2] Heretofore, adjudication under the Commerce Clause has invoked a sensitive judicial scrutiny, entailing "a consideration of all the facts and circumstances, such as the nature of the regulation, its function, the character of the business involved and the actual effect on the flow of commerce." *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (1927) (Stone, J., dissenting). See *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 371 (1976).

in treating what is essentially a problem of striking a balance between competing interests as an exercise in absolutes." *Id.*, at 564.

I

I note that appellants do not claim and the Court does not and could not find that the market for scrap metal— including its processing—is not interstate commerce. In addition, there is no claim by appellee that Maryland, if it wishes to run a bounty program to achieve its environmental objectives, must pay a bounty on all scrap hulks irrespective of their State of origin as abandoned vehicles. Plainly Maryland pursuant to its environmental program may "artificially enhance" the price of only those hulks originating as abandoned vehicles within its boundaries. The only questions respecting the Commerce Clause concern the issue of whether Maryland may in effect require that the processing of such scrap, an aspect of its program not obviously related in the first instance to its environmental objectives, be restricted to processors located within the State in light of the asserted governmental objectives in so doing and the consequent effect upon interstate commerce.

However, I cannot agree with the Court that this case is solely to be analyzed in terms of Maryland's "purchase" of items of interstate commerce and its restriction of such "purchases" to items processed in its own State. The result of this single-minded concept of the issues presented is that the Court in my view not only erroneously decides a weighty constitutional question not previously directly addressed by this Court, but also that it ignores another and equally pressing issue under the Commerce Clause.

II

I first address the question that the Court answers: the question whether a State may restrict its purchases

of items of interstate commerce to items produced, manufactured, or processed within its own boundaries. When a State so restricts purchases for its own use, it does not affect the total flow of interstate commerce, but rather precludes only that quantum that would otherwise occur if the State were to behave as a private and disinterested purchaser. Nevertheless, it cannot be gainsaid that a State's refusal for purposes of economic protectionism to purchase for end use items produced elsewhere is a facial and obvious "discrimination against interstate commerce" that we have often said "[t]he commerce clause, by its own force, prohibits . . . , whatever its form or method." *South Carolina Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S., at 185. See *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 535; *Best & Co.* v. *Maxwell,* 311 U. S. 454, 455–456 (1940); *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 596 (1923). Clearly the "aim and effect" of such a discrimination is "establishing an economic barrier against competition with the products of another state or the labor of its residents," *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 527 (1935). Certainly the Court's naked assertion today that "[n]othing in the purposes animating the Commerce Clause prohibits a State . . . from participating in the market and exercising the right to favor its own citizens over others," *ante,* at 810, stands in stark contrast to our "repeated emphasis upon the principle that the State may not promote its own economic advantages by curtailment or burdening of interstate commerce." *H. P. Hood & Sons, Inc.* v. *Du Mond, supra,* at 532.

Moreover, the particular form of discrimination arising when the State restricts its purchases for use to items produced in its own State is of a kind particularly suspect under our precedents, as it is aimed directly at re-

quiring the relocation of labor and industry within the bounds of the State, thus tending "to neutralize advantages belonging to" other States, *Baldwin* v. *G. A. F. Seelig, Inc., supra,* at 527; *Halliburton Oil Well Co.* v. *Reily,* 373 U. S. 64, 72 (1963), and forcing "an artificial rigidity on the economic pattern of the industry." *Toomer* v. *Witsell,* 334 U. S. 385, 404 (1948). See *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928). We have "viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. *Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually* per se *illegal." Pike* v. *Bruce Church, Inc.,* 397 U. S., at 145 (emphasis supplied). And we have never held protection of a State's own citizens from the burden of economic competition with citizens of other States to be such a "clearly legitimate local interest." See, *e. g., H. P. Hood & Sons, Inc., supra; Baldwin* v. *G. A. F. Seelig, Inc., supra.* Patently, so to hold "would be to eat up the rule under the guise of an exception." 294 U. S., at 523.

It is true, as the Court notes, that we have not previously directly addressed the question whether, when a State enters the market as purchaser for end use of items in interstate commerce, it may "[restrict] its trade to its own citizens or businesses within the State." *Ante,* at 808.[3] The novelty of the question, however, does not

---

[3] The Court has, however, summarily affirmed a lower court ruling to this effect, which distinguished state purchases in a "proprietary" capacity of goods for its own use from other state burdens imposed on interstate commerce. *American Yearbook Co.* v. *Askew,* 339 F. Supp. 719 (MD Fla.), summarily aff'd, 409 U. S. 904 (1972) (BRENNAN and WHITE, JJ., voting to note probable jurisdiction).

The Court has said in other contexts that "[l]ike private individuals and businesses, the Government enjoys the unrestricted

justify the Court's conclusory assertion, without analysis employing established constitutional principles or policies, that "[n]othing in the purposes animating the Commerce Clause prohibits a State . . . from participating in the market and exercising the right to favor its own citizens over others." *Ante,* at 810. Certainly the Court does not attempt to tell us the source of any such "right." [4] Others have argued that the barriers to interstate commerce imposed by restrictive state purchasing policies are already of great significance, Melder, The

---

power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 127 (1940). See also *Heim* v. *McCall,* 239 U. S. 175, 191–192 (1915); *Atkin* v. *Kansas,* 191 U.S. 207, 222–223 (1903). None of these cases involved challenges to restrictive state purchasing statutes under the Commerce Clause. Cf. *Field* v. *Barber Asphalt Co.,* 194 U. S. 618 (1904), which upheld in the face of a Commerce Clause challenge local governmental contracts that mandated the purchase of out-of-state materials.

[4] The absence of any articulated principle justifying this summary conclusion leads me to infer that the newly announced "state sovereignty" doctrine of *National League of Cities* v. *Usery, post,* p. 833, is also the motivating rationale behind this holding. It is true that the Court disclaims any conclusion today respecting congressional power to legislate in this area, *ante,* at 810 n. 19, and I hope that is so. I confess a logical difficulty, however, in understanding why, if the instant state action is not "the kind of action with which the Commerce Clause is concerned," *ante,* at 805, there can be any congressional power to legislate in this area. This exposes one of the difficulties with the Court's categorical approach to today's decision, which simply carves out an area of state action to which it declares the Commerce Clause has no application, rather than employing heretofore accepted principles of analysis looking to the state interest asserted, the impact on interstate commerce flowing from the challenged action, and the availability of reasonable and nondiscriminatory methods for achieving the state interest, and concluding with a reasoned and considered judgment under all the circumstances of the permissibility of the action.

Economics of Trade Barriers, 16 Ind. L. J. 127, 139–141 (1940), and other courts have refused, "in the light of the expanding proprietary activities of the states," invitations to forgo all Commerce Clause analysis merely because the State is acting in a proprietary purchasing capacity in implementing its discriminatory policies. *Garden State Dairies of Vineland, Inc.* v. *Sills,* 46 N. J. 349, 358, 217 A. 2d 126, 130 (1966). See also Recent Cases, 80 Harv. L. Rev. 1357, 1360–1361 (1967).

I would hold, consistent with accepted Commerce Clause principles, that state statutes that facially or in practical effect restrict state purchases of items in interstate commerce to those produced within the State are invalid unless justified by asserted state interests—other than economic protectionism—in regulating matters of local concern for which "reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are [not] available." *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951). See *Great A&P Tea Co.* v. *Cottrell,* 424 U. S., at 373; *Pike* v. *Bruce Church, Inc., supra,* at 142; *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361, 375 n. 9 (1964); *Baldwin* v. *G. A. F. Seelig, Inc., supra,* at 524.[5]

---

[5] In *Pike* v. *Bruce Church, Inc.,* although we stated that "statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere" are burdens on commerce "virtually *per se* illegal," 397 U. S., at 145, we recognized that such an effect as "an incidental consequence of a regulatory scheme could perhaps be tolerated" if necessary to achieve substantial state interests in regulating matters of local concern. *Id.,* at 146. Accordingly, even in this area of effect on interstate commerce we recognized the need for our traditional balancing approach to Commerce Clause analysis, *id.,* at 142, rather than the absolutist approach employed by the Court today.

For my conclusions respecting whether the instant statutory discrimination may be justified under accepted Commerce Clause principles, see *infra,* Part IV.

## III

Second, the Court's insistence on viewing this case as qualitatively different under the Commerce Clause merely because the State is in some sense acting as a "purchaser" of the affected items of commerce leads it completely to forgo analysis of another equally vital question. For even those courts and commentators that have concluded that facially restrictive state purchasing statutes are permissible under the Commerce Clause, *e. g., American Yearbook Co.* v. *Askew,* 339 F. Supp. 719 (MD Fla.), summarily aff'd, 409 U. S. 904 (1972); McAllister, Court, Congress and Trade Barriers, 16 Ind. L. J. 144, 164–165 (1940), have restricted this conclusion to instances where the State in a "proprietary" capacity is purchasing items of commerce for end use, and have distinguished other modes of regulation burdening interstate commerce. But it is clear that Maryland in the instant case is not "purchasing" scrap processing for end use; rather, by in effect requiring "price enhanced" hulks to be processed within the State of Maryland, it is affecting one link in the chain of interstate commerce for scrap metal, a line of commerce that originates prior to Maryland's regulation and continues long past that point. Even if, as the Court concludes, state economic protectionism in "purchasing" items of interstate commerce is not a suspect motive under the Commerce Clause, analysis in this case cannot cease at that point, for by the instant regulation Maryland is allegedly affecting a larger area of commerce by diverting processing of scrap metal in interstate commerce to within its own boundaries.[6]

---

[6] When the State simply refuses to purchase for its own use items that have been processed out of State, the impact on interstate commerce may be crudely measured by multiplying the value added in processing times the number of items the State purchases. In this

The Court's only apparent reference to this impact on the larger area of commerce in scrap metal is that "Maryland has not *sought* to prohibit the flow of hulks,

case, however, the impact on commerce is not so restricted; the State in effect not only requires that the value added by processing in respect to the State's environmental objectives—presumptively the amount of the bounty paid which is retained by the processors, a small amount since the record shows that processors customarily pass the largest portion of the bounty on to the scrap haulers—be added within the State, but also that the entire addition of value, including that occurring in response to market demand for scrap metal *qua* metal, be done within the State. In other words, by this mode of regulation, as opposed to what occurs by virtue of restrictions on proprietary purchases for the State's own use, Maryland is in effect diverting processing to locations within its borders of both that element of value that it "purchases," *and* that arising in response to interstate demand for scrap metal that it does not "purchase."

The concurring opinion asserts that "by hypothesis," a hypothesis unsupported in the record, see *infra*, at 831, and n. 8, "we are dealing with a business that is dependent on the availability of subsidy payments," "[t]hat [the] commerce, which is now said to be burdened, would never have existed if in the first instance Maryland had decided to confine its subsidy to operators of Maryland plants," and that the " 'burden' on the Virginia processor is caused by the nonreceipt of the subsidy, regardless of whether or not Maryland elects to continue to subsidize its local plants." *Ante*, at 815, 816. With all respect, however, the evidence and legal arguments are to the contrary. An uncontradicted affidavit in the record reveals that $14 of the $16 "subsidy" is customarily passed on to the scrap hauler, App. 79A, and the inability of the out-of-state processor to pass this subsidy on to the haulers, rather than simply the lack of subsidization of scrap processing itself, is alleged to burden interstate commerce by diverting scrap processing to Maryland.

The complaint alleges that "[a] substantial portion of the Plaintiff's business consists of the destruction and processing of vehicles acquired in interstate commerce from towers and other third persons in Maryland"; that the challenged amendment "enabl[es] Maryland scrap processors to provide financial inducements to [towers] while depriving the plaintiff of the ability to provide [the] same"; that "[i]n consequence . . . the plaintiff is placed at a

or to regulate the conditions under which it may occur." *Ante*, at 806 (emphasis supplied). This conclusion is arguable at best,[7] and our cases establish that "[o]ne challenging the validity of a state enactment" on Com-

---

severe competitive and economic disadvantage with Maryland scrap processors because of the arbitrary diversion of [hulks] away from the normal channels of interstate commerce"; and that appellee has been "depriv[ed] . . . of a vital source of scrap, iron, steel and nonferrous scrap which normally moved in interstate commerce." *Id.*, at 10A–11A.

The stipulated facts establish that the "market value of . . . hulks is heavily dependent upon the prices steel mills are willing to pay for . . . scrap [metal], which in turn is influenced by national and international economic conditions," and that "[t]he result is relatively fierce competition by scrap processors for the acquisition of the available . . . hulks." *Id.*, at 59A.

An uncontradicted affidavit in the record asserts that "[t]he lifeblood of the scrap metal processing industry is old cars," that "[t]he primary source of Plaintiff's raw materials is trade in . . . hulks," and that "[a] very substantial portion of the Plaintiff's trade in old cars is derived from Maryland." *Id.*, at 74A–75A. "The ability to acquire eight year old or older [hulks] from Maryland . . . is of crucial importance to the conduct of the Plaintiff's business," *id.*, at 78A, and the market response to the challenged amendment which disabled appellee from passing the bounty on to the haulers "was an almost total abandonment of Plaintiff by its former regular [haulers participating in the bounty program]." "[I]n times of scarcity of old cars when both the offering price is high and the competition [among scrap processors] for the available cars is sharpest, the ability to [pass the bounty on to the scrap haulers] which is, in effect, an offer of a higher price without increasing the cost of the raw material to the processor, imparts a distinct competitive edge to those processors fully able to participate in the bounty program." *Id.*, at 82A–83A.

[7] The preamble to the Act amending the method by which scrap processors may obtain title sufficient for participation in the bounty program and limiting the only practical method to scrap processors located within the State declares that the Act is "[f]or the purpose of protecting *certain* scrap processors who destroy certain abandoned motor vehicles . . . ." *Id.*, at 15A (emphasis in original).

merce Clause grounds is not bound by the State's "declarations of purpose" and may show that the purported objective "is a feigned and not the real purpose." *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S., at 10. See also *Toomer* v. *Witsell,* 334 U. S. 385 (1948); *Buck* v. *Kuykendall,* 267 U. S. 307, 315–316 (1925). More importantly, regardless of the purity of the State's motives or intent with respect to burdening interstate commerce, analysis does not cease at that point for " 'a state may not, in any form or under any guise, directly burden the prosecution of interstate business.' " *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S., at 522; see *Best & Co.* v. *Maxwell,* 311 U. S., at 455–456. "A different view . . . would mean that the Commerce Clause of itself imposes no limitations on state action . . . , save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co.* v. *Madison,* 340 U. S., at 354.

Rather, once a legitimate state regulation of an object of local concern is found to burden interstate commerce, "this states the beginning of a problem in constitutional law; it does not give the answer." *Bode* v. *Barrett,* 344 U. S. 583, 589 (1953) (Frankfurter, J., dissenting). Established principles dictate that in such a situation analysis proceed as follows:

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be pro-

moted as well with a lesser impact on interstate activities." *Pike* v. *Bruce Church, Inc.,* 397 U. S., at 142.

Mr. Justice Frankfurter, universally recognized to be among the foremost students and judicial practitioners of the jurisprudence of the Commerce Clause, has said:

> "The Willson decision [*Willson* v. *Black-Bird Creek Marsh Co.,* 2 Pet. 245 (1829)] begins a wholesome emphasis upon the concrete elements of the situation that concerns both state and national interests. The particularities of a local statute touch its special aims and the scope of their fulfillment, the difficulties which it seeks to adjust, the price at which it does so. These and kindred practical considerations, in their myriad manifestations, have weighed with the Court in determining the fate of state legislation impinging on the activities of national commerce, ever since Marshall in the *Willson* case set the standard for deciding such controversies 'under all the circumstances of the case.' . . . In the history of the Supreme Court no single quality more differentiates judges than the acuteness of their realization that practical considerations, however screened by doctrine, underlie resolution of conflicts between state and national power." F. Frankfurter, The Commerce Clause Under Marshall, Taney and Waite 33–34 (1937).

The Court today fails that test in my view by mechanically concluding that Maryland's action is not "the kind of action with which the Commerce Clause is concerned," *ante,* at 805, merely because the State is in some sense acting as a "purchaser" of items in interstate commerce. In the absence of some limiting principle, this is a disturbing conclusion, for little imagination is required to

foresee future state actions "set[ting] barrier[s] to traffic between one state and another as effective as if customs duties . . . had been laid upon the thing transported," *Baldwin* v. *G. A. F. Seelig, Inc., supra,* at 521. This can surely occur if all state action is to be immunized from further analysis merely because the design of the regulatory scheme is to "artificially enhance" the price of goods produced within its State by the State's becoming in some sense a "purchaser" of such goods at a point in the total line of commerce short of end purchaser.

It may well be, as developed in Part IV, *infra,* that there are limiting principles in the circumstances of this case because, by means of its policy restricting the location of scrap processing, Maryland is truly regulating matters of local concern respecting its environment and there is as a practical matter an absence of "reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests." *Dean Milk Co.* v. *Madison, supra,* at 354. But the Court fails to search for such limiting circumstances and shuts off analysis merely because of the form of the state regulation, thus effectively "immun[izing]" state "statutes . . . requiring that certain kinds of processing be done in the home State before shipment to a sister State," *Pike* v. *Bruce Church, Inc., supra,* at 141, so long as the mode of regulation may be characterized as the State functioning as a "purchaser." Clearly, if the States are to be absolutely unrestrained in their regulation of interstate markets so long as they use methods that may fairly be characterized as "purchasing" items by "artificially enhancing" the price, then the door is open for the States to " 'set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.' " *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S., at 377.

## IV

Maryland argues that its effective preclusion of out-of-state scrap processors from the relevant portion of the bounty program is required in order to help ensure that bounty payments are limited to hulks abandoned within Maryland and that its public funds are not used in effect to aid in the clearance of hulks abandoned in other States. Certainly this asserted interest is a legitimate object of local concern, and since *Willson* v. *Black-Bird Creek Marsh Co.,* 2 Pet. 245 (1829), we have "recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S., at 767; see *Huron Cement Co.* v. *Detroit,* 362 U. S. 440, 443–444 (1960). But the mere assertion of a legitimate local interest being served by the challenged regulation does not end the matter, for there exists an "infinite variety of cases, in which regulation of local matters may also operate as a regulation of commerce, in which reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan, supra,* at 768–769. In resolving such questions in close cases, the Court is necessarily involved in "differences of degree [resolution of which] depend[s] on slight differences of fact." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S., at 572 (Frankfurter, J., dissenting); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan, supra,* at 796 (Douglas, J., dissenting), and an adequate record containing the "relevant factual material which will 'afford a sure basis' for an informed judgment" is required.

*Id.*, at 770 (Court's opinion). Such a record is lacking in the instant case.

This case comes to us in a summary judgment posture, and, respecting the impact of the state regulation on the larger area of interstate commerce, the record as the Court notes "contains no details of the hulk [processing] market prior to the bounty scheme." *Ante*, at 809 n. 18.[8] Similarly, respecting the State's justification for the preclusion of out-of-state processors—ensuring that bounties are not paid for hulks originating out of State—the record, as the Court also notes but only in the equal protection context, contains no evidence of whether this objective is in fact achieved by the challenged action or in what degree. Nor is the record developed in regard to the availability of "reasonable nondiscriminatory alternatives, adequate to conserve [this] legitimate local [interest]." *Dean Milk Co.* v. *Madison*, 340 U. S., at 354. The only evidence in the record is speculative at best, revealing that neither the statute nor administrative regulations promulgated thereunder limit bounty payments to hulks originating in Maryland or protect against hulks originating out of State from being processed by in-state processors under the bounty program. Nevertheless, an adequately developed factual record might well inform a judgment that the simple preclusion of out-of-state processors, in light of transportation costs to scrap haulers when they haul Maryland hulks to out-of-state processors, is as reasonable and inexpensive a

[8] The concurring opinion asserts that the interstate market in processing scrap metal allegedly burdened by Maryland's bounty scheme as amended "was previously too small to be significant." *Ante*, at 815 n. Nothing in the record supports this factual judgment, as appellants themselves argue, Brief for Appellants 37–39; Reply Brief for Appellants 2–3, and as the Court below noted, 391 F. Supp. 46, 62 (1975).

means of ensuring that bounty payments are not made for hulks originating out of State as is available to the State under all the circumstances. Accordingly, I would vacate the judgment below and remand for the development of a record adequate to inform a reasonable judgment on these factual issues. *Florida Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 136–137 (1963); *H. P. Hood & Sons, Inc.* v. *Du Mond, supra,* at 574 (Frankfurter, J., dissenting).