AMERICAN MOTORS SALES CORPO-RATION et al., Plaintiffs,

v.

DIVISION OF MOTOR VEHICLES OF the COMMONWEALTH OF VIRGINIA et al., Defendants.

Civ. A. No. 76–0513–R.

United States District Court, E. D. Virginia, Richmond Division.

Feb. 13, 1978.

 

John F. Kay, Jr., Lewis T. Stoneburner, Mays, Valentine, Davenport & Moore, Richmond, Va., for plaintiffs.

John Hardin Young, Ronald W. Fahy, Asst. Atty. Gen. of Va., James E. Farnham, David F. Peters, Jack E. McClard, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, American Motor Sales Corporation (American) and Early AMC, Inc. (Early), bring this action challenging the constitutionality of § 46.1–547(d) of the Code of Virginia and seeking declaratory and injunctive relief. Defendants are the Division of Motor Vehicles of the State of Virginia (DMV) and Vern L. Hill, Commissioner of the DMV (the Commissioner). P. D. Waugh & Co. (Waugh) and the Virginia Automobile Dealers Association (Dealers Association) have intervened as defendants. Jurisdiction is attained pursuant to 28 U.S.C. §§ 1331(a), 1337, 1343(3) and 2201. The matter comes before the Court on cross motions for summary judgment and is ripe for disposition.

Section 46.1–547(d), the challenged statute, provides that it is unlawful for any manufacturer or distributor of motor vehicles:

To grant an additional franchise for a particular line-make of motor vehicle in a trade area already served by a dealer or dealers in that line-make unless the franchisor has first advised in writing such other dealers in the line-make in the trade area; *provided that no such additional franchise may be established in the trade area if the Commissioner has determined, if requested by any party within thirty days after receipt of the franchisor's notice of intention to establish the additional franchise, and after a hearing on the matter, that there is reasonable evidence that after the grant of the new franchise, the market will not support all of the dealerships in that line-make in the trade area;* provided, further, that a reopening of a franchise in a trade area that has not been in operation for more than one year shall be deemed the establishment of a new franchise subject to the terms of this subsection. [Emphasis added].

The uncontested facts leading to the instant challenge are as follows:

Plaintiff American is in the business of selling AMC and Jeep motor vehicles, parts and accessories to franchised dealers throughout the United States, including Virginia. American is a "manufacturer" and "distributor" of motor vehicles within the meaning of § 46.1–547 of the Virginia Code. Plaintiff Early is a motor vehicle dealership located in Orange, Virginia, presently holding franchises to sell Subaru and AMC vehicles, but not Jeeps.

Defendant DMV is an agency of the State of Virginia having the power and duty of administering the motor vehicle laws of the State, including § 46.1–547(d). Defendant Hill is the Commissioner of the DMV and is responsible for administering the provisions of the Virginia Motor Vehicle Dealer Licensing Act (Title 46.1, Chapter 7 of the Virginia Code), including § 46.1–547(d). Additionally, Hill is charged under the provisions of § 46.1–547(a) & (b) of the Virginia Code with promoting the interest of retail buyers of motor vehicles and with preventing unfair methods of competition and unfair or deceptive acts or practices in the motor vehicle trade. Defendant intervenor P. D. Waugh & Co. is a motor vehicle dealer in Orange, Virginia currently holding a non-exclusive franchise for the sale of Jeep vehicles. Defendant intervenor Dealers Association is a statewide trade association for Virginia automobile dealers which assisted in the drafting of § 46.1–547(d).

In April 1975, upon the request of plaintiff Early, American offered Early a Jeep franchise to be operated at Early's established location in Orange, Virginia. Since Waugh already held (and still holds) a Jeep franchise in Orange, Virginia, Early's Jeep franchise would be an "additional franchise for a particular line-make of motor vehicle in a trade area already served by a dealer or dealers in that line-make" within the meaning of the challenged statute.

On October 28, 1975, pursuant to the terms of the statute, American advised Waugh in writing of its intention to grant the additional Jeep franchise in Orange, Virginia. Waugh, exercising its rights under the statute, requested that the Commissioner hold a hearing to determine whether the market would support all of the dealerships in the Jeep line-make should such additional franchise be granted. On February 20, 1976, a hearing officer for the Division conducted the appropriate hearing, and found that Waugh's sales performance had been below American's expectations. The hearing officer therefore concluded that the contemplated additional Jeep franchise should be allowed on the grounds that no reasonable evidence had been produced that the market would not support all of the dealerships in the Jeep line-make after the grant of Early's franchise. Upon review, however, the Commissioner disagreed with the hearing officer's conclusion and issued a decision prohibiting American from granting the proposed franchise to Early.

Plaintiffs contend that they have lost and continue to lose substantial sales of Jeep vehicles as a direct result of the Commissioner's decision. Plaintiffs pray for a declaratory judgment that § 46.1–547(d) violates the Supremacy, Commerce, Due Proc-

ess and Equal Protection Clauses of the Constitution of the United States, and seek from this Court an injunction prohibiting the DMV and its agents from enforcing the provisions of the challenged statute.

For the reasons which follow, the Court finds that Virginia Code § 46.1–547(d) violates the Commerce Clause of the Constitution of the United States.

■ That the challenged statute affects interstate commerce is beyond question. Only Ford and Volvo motor vehicles are manufactured within the borders of the Commonwealth of Virginia. All other makes of motor vehicles sold in Virginia, including Jeeps, are manufactured outside of Virginia and hence are articles of interstate commerce. Because the challenged statute restricts the sale of automobiles at certain locations, it affects interstate commerce.

In *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976), the Supreme Court enunciated the test for determining the validity of state statutes affecting interstate commerce:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . .
> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 371–72, 96 S.Ct. at 928, 47 L.Ed.2d at 60–61 (citations and footnote omitted).

The threshold inquiry under *Cottrell* is to determine whether the challenged statute effectuates "a legitimate local purpose."

Although there is no meaningful legislative history available for § 46.1–547(d), the defendants assert that the statute has two major purposes. First, defendants contend that the statute preserves competition in retail automobile sales within the Commonwealth. Second, defendants argue that the statute provides the franchised automobile dealers with a minimum of protection against unfair and unreasonable treatment by automobile manufacturers and distributors.

*The Purpose of Preserving Competition*

Defendants contend that § 46.1–547(d) preserves competition in retail automobile sales in Virginia by prohibiting manufacturers from granting an excessive number of franchises in a given trade area, a practice which could lead to destructive competition and consequent business failures. In the defendants' view, the statute thus protects the goodwill, equity and investment of motor vehicle dealers. Additionally, defendants argue, the statute protects the interests of the consuming public in the continuous operation of reasonably accessible motor vehicle dealers, resulting in wider selection, lower prices and better maintenance and service facilities. Finally, defendants contend that the statute protects against the adverse affects of business failures on employment and the general economy.

Similar contentions were asserted by the State in the case of *Buck v. Kuykendall*, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925). In *Buck*, the challenged state statute prohibited common carriers from operating for hire over regular routes without first obtaining from the State a certificate declaring that the public convenience and necessity required such operation. Such a certificate could not be granted for any territory which was "already being adequately served." The appellant in *Buck* had applied for a certificate and had been refused on grounds that adequate transportation facilities were already available for his proposed route. The State argued that it owned and maintained the highways and was responsible for securing the safety and public convenience in the use of them. If too many vehicles used the highways, both the danger

and wear and tear grew. The exclusion of unnecessary vehicles promoted both safety and economy. Thus, the State argued, its statute was "not objectionable because it is designed primarily to promote good service by excluding unnecessary competing carriers." 267 U.S. at 314–15, 45 S.Ct. at 326.

The Supreme Court squarely rejected the State's contention. Mr. Justice Brandeis, speaking for the Court, characterized the statute as follows:

> Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines, not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons, while permitting it to others for the same purpose and in the same manner. . . . Thus, the provision of the Washington statute is a regulation, not of the use of its own highways, but of interstate commerce. Its effect upon such commerce is not merely to burden, but to obstruct it. Such state action is forbidden by the commerce clause.

267 U.S. at 315–16, 45 S.Ct. at 326.

■ Precisely the same conclusion is mandated in the instant case. The challenged Virginia statute is designed not to promote safety or public health but to prohibit additional competition in certain areas. Section 46.1–547(d) determines not the manner in which automobiles may be sold but rather who may sell them. The statute prohibits Early from selling Jeep vehicles while permitting Waugh to sell Jeep vehicles "for the same purpose and in the same manner" proposed by plaintiffs. Thus, the challenged statute is a regulation not merely of Virginia's markets, but of interstate commerce itself. Its effect on interstate commerce is "not merely to burden but to obstruct it," for plaintiff American is totally prohibited from selling Jeep vehicles through Early's present franchise. Under *Buck v. Kuykendall*, such a result is inconsistent with the mandates of the Commerce Clause of the Constitution of the United States.

In *H. P. Hood & Sons v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), the Supreme Court reaffirmed the principle of *Buck v. Kuykendall*. In *Hood*, the Court struck down a New York statute which granted the state the power to deny a license for a new milk receiving plant unless the State's Commissioner of Agriculture and Markets was satisfied "that the issuance of the license will not tend to a destructive competition in a market already adequately served."

The statute at issue in the instant case is almost identical in effect to the provision declared unconstitutional in *Hood*. Section 46.1–547(d) effectively gives the defendant Commissioner authority to deny permission for a new automobile franchise in Virginia unless he is satisfied that any such franchise will not be destructive of any dealerships in the same line-make of motor vehicle already serving the trade area. In *Hood*, the Court condemned such efforts to use state police powers as a basis for suppressing competition. After citing *Buck v. Kuykendall* as authority for striking down "parochial legislative policies" designed to limit competition, 336 U.S. at 538, 69 S.Ct. 657, the *Hood* Court declared:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to *every market* in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

336 U.S. at 539, 69 S.Ct. at 665 (emphasis added).

The instant case is to be governed by this doctrine. Plaintiffs must be accorded free access to every market in the Nation, including Orange, Virginia. The State cannot assert the purpose of preserving compe-

tition as appropriate justification for denying plaintiffs a new franchise in the location of their choosing.

The wisdom of the *Hood* doctrine has often been reaffirmed. The United States Supreme Court has frequently cited and quoted from *Hood* with approval in recent Terms. *See, e. g., Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 285 n. 21, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 808, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976); *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 380, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976).

More recently, in *Great Western United Corp. v. Kidwell*, 439 F.Supp. 420 (N.D.Tex. 1977), the court cited *Hood* in declaring Idaho's highly restrictive tender offer statute unconstitutional under the Commerce Clause. Rejecting arguments similar to the ones made in the instant case, the court stated:

> The ultimate purpose of the Idaho statute is to thwart tender offers and thereby prevent possible removal of the target company or its management, the closing of plants and related effects on the state's economy. But a state may not legitimate its regulation of interstate commerce by asserting this type of interest. As stated by the Supreme Court in *Hood* . . ., a statute may not be enacted "solely for protection of local economic interests."

*Id.* at 438. In the instant case as well, though Virginia may fear adverse economic and social consequences if automobile manufacturers are allowed unrestricted access to all Virginia markets, such state interests cannot justify § 46.1–547(d).

■ The Court thus concludes that the purpose of preserving competition in retail automobile sales in Virginia is not a "legitimate local purpose" under the Commerce Clause. The statute therefore cannot stand on that purpose. This conclusion, however, is not the end of the Court's inquiry. The Court must still consider whether the second purpose asserted by defendants, the protection of automobile dealers against unfair treatment by manufacturers, satisfies the test of *A & P v. Cottrell.*

### The Purpose of Protecting Against Unfair Trade Practices

Defendants assert that § 46.1–547(d) is supported by the legitimate state interest of protecting small independent automobile dealers from unfair and abusive treatment by the giant automobile manufacturers. The Court is in full agreement that this is a "legitimate local purpose" under the Commerce Clause. The abuses occasioned by the vast disparity in bargaining power between individual motor vehicle franchises and the megacorporations which manufacture and distribute motor vehicles are well documented in the legislative history of the Federal Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225. See H.R.Rep.No. 2850, 84th Cong., 2d Sess., *reprinted in* [1956] *U. S. Code Cong, & Admin. News* p. 4596. Even counsel for American acknowledged in his opening statement at the DMV hearing that it would be an unfair trade practice for a manufacturer to establish so many dealerships in a trade area that it would be a foregone conclusion that not all of the dealers would be able to meet the minimum sales requirements specified in their contracts.[1] As counsel for American recognized, such deliberate overloading would give the manufacturer power under the terms of the standard franchise agreement to "start terminating willy-nilly." The State undoubtedly has authority to combat such a practice.

■ Despite this legitimate local purpose, the Court concludes that § 46.1–547(d) is unconstitutional under the rule of *A & P v. Cottrell* because the State's purpose "could be promoted as well with a lesser impact on interstate activities." 424 U.S. at 372, 96 S.Ct. at 928.

1. The standard Jeep dealership franchise contract includes a specific minimum sales requirement. A dealer's failure to meet the minimum sales requirement may be cause for termination. Apparently other motor vehicle manufacturers also write minimum sales requirements into their franchise agreements.

The defendants' theory is that the establishment of an additional franchise in a trade area which will not support all dealerships after the grant of the additional franchise can have no other purpose than to derive an existing dealer out of business. Accordingly, defendants argue that § 46.1–547(d) is necessary to prevent manufacturers from deliberately overloading a trade area with the intention of forcing certain dealers out of business. Defendants also argue that without § 46.1–547(d)'s restrictions on additional franchises, manufacturers could run established dealers out of business with impunity by setting up competing "sweetheart" dealerships which would gain an unfair competitive advantage. In the defendants' view, § 46.1–547(d) provides the minimum necessary restrictions to guard against these unfair trade practices.

The defendants' explanation, while appealing on the surface, is tainted at the roots. According to the defendants, the Commissioner's determination under § 46.-1–547(d) that an additional franchise will overload the market proves that the manufacturer is acting in bad faith. But this implicit statutory presumption is entirely without support. Indeed, it is contradicted by the facts of this case, by the legislative history of the Federal Dealers' Day in Court Act, and by other evidence before this Court.

The facts of this case were developed at the DMV hearing convened at Waugh's request pursuant to § 46.1–547(d) on February 20, 1976. At that hearing Waugh challenged American's right to grant a Jeep franchise to Early at his Orange, Virginia location. Waugh sought to meet its evidentiary burden under § 46.1–547(d) by offering testimony that three of the principal employers in Orange County had recently shut down their manufacturing operations; that unemployment in Orange County had consequently climbed to 14% (well above the Virginia State average); and that the projected population growth for Orange County was very low and did not augur well for increased Jeep sales. Waugh acknowledged that his sales had fallen below his contractual minimum sales requirement during 1974 and 1975, but he argued that his minimum sales requirement was unrealistically high because the Orange, Virginia economy was in recession and because American had arbitrarily expanded the trade area on which his minimum sales requirement was based. Waugh further argued that he had aggressively pursued sales in his assigned trade area and that there was no slack in the market that could be taken up by a new dealership in Orange without hurting Waugh's sales. Waugh concluded that the Orange, Virginia trade area could not support an additional Jeep dealership and that American's only possible intention in offering a franchise to Early was to push Waugh out of the market.

American sought to counter Waugh's conclusions by presenting evidence that Waugh's minimum sales requirement had been calculated according to the same formula used by American nationally; that this formula had proven accurate and realistic in past years; and that Waugh's poor sales record in 1974 and 1975 could not be explained by high unemployment in Orange because other line-makes of four-wheel-drive vehicles had continued to prosper in the same trade area. American therefore contended that the Orange, Virginia market area would support an additional Jeep franchise; that the additional Jeep franchise would not take sales away from Waugh but rather would capture the potential sales which Waugh had been losing; and that the establishment of Early's franchise was in no way intended to drive Waugh out of business. On the contrary, American asserted that it had elected to establish a second Jeep dealership in Waugh's market area as an alternative to terminating Waugh for his below-contract sales record, and had no intention of phasing out Waugh's Jeep dealership after Early's franchise was established.

Despite the Commissioner's determination that an additional Jeep franchise in Orange would violate the terms of § 46.1–547(d), the Court finds no evidence in the hearing record of bad faith on the part of

American. Waugh did not show that American had calculated his minimum sales requirement by using a formula different from that applied to every other Jeep dealer in the Nation. Nor was it shown that American's national formula was irrational or historically inaccurate. Moreover, Waugh did not present a scintilla of evidence that American intended to give Early favorable "sweetheart" treatment in order to drive Waugh out of business. Thus, even if the Commissioner is correct that an additional Jeep dealership in Orange, Virginia would overload the market, the facts of this case lend no support to the implicit statutory presumption of bad faith on the part of the manufacturer.

The legislative history of the Federal Dealers' Day in Court Act also undercuts the presumption of bad faith implicit in § 46.1–547(d). The Federal Act guarantees dealers freedom from threats, coercion or intimidation by manufacturers. *See* 15 U.S.C. §§ 1221–1222. However, the Federal Act does not contain any provision parallel to § 46.1–547(d) of the Virginia Code. The House Report accompanying the Federal Act explained the absence of such a provision as follows:

> The bill does not freeze present channels or methods of automobile distribution and would not prohibit a manufacturer from appointing an additional dealer in a community provided that the establishment of the new dealer is not a device by the manufacturer to coerce or intimidate an existing dealer. *The committee emphasizes that the bill does not afford the dealer the right to be free from competition from additional franchise dealers. Appointment of added dealers in an area is a normal competitive method of securing better distribution* and curtailment of this right would be inconsistent with the antitrust objectives of this legislation. Under the bill, a manufacturer does not guarantee the dealer profitable operation or freedom from depletion of investment.

[1956] *U. S. Code Cong. & Admin. News, supra* at pp. 4603–04 (emphasis added). Thus, the Congress of the United States

saw nothing inherently abusive in the establishment of competing dealerships in a trade area even when the additional dealership threatened to diminish an existing dealer's profit or undermine his investment. In contrast to the Virginia statute's implicit presumption that a new dealership is an act of bad faith by the manufacturer if the market will be unable to support all dealerships in the area, the Federal Act requires independent proof of bad faith before the additional dealership can be prohibited.

Federal courts have frequently relied on the legislative history of the Federal Act in holding that the establishment of a competitive dealership in the same line-make does not by itself constitute a breach of good faith. *See, e. g., Southern Rambler Sales, Inc. v. American Motors Corp.,* 375 F.2d 932 (5th Cir. 1967); *Garvin v. American Motors Sales Corp.,* 318 F.2d 518 (3d Cir. 1963). In *Garvin,* for example, an American Motors dealer argued, as Waugh argues here, that the establishment of a competing American Motors dealership in his one-dealer town constituted an act of bad faith by the manufacturer. The Court flatly rejected the plaintiff's contention, stating: "[T]he record is completely devoid of any evidence to show that the new dealership was established as a device to coerce Garvin. In the absence of such a showing, plaintiff's argument is without merit." 318 F.2d at 520.

Finally, the presumption of bad faith underlying § 46.1–547(d) is refuted by the uncontroverted affidavit of American's Franchise Review Manager, Mr. Thomas Kessler. Based upon his studies of six separate American market areas around the country, Mr. Kessler found that existing Jeep dealerships under competent management usually increase their sales after a competing dealership is added in their trade area. Such sales increases are explained, according to Mr. Kessler, by the increases in advertising, service facilities, and customer traffic that accompany the establishment of an additional dealership in a trade area. Mr. Kessler also stated, based on his twenty-three years in the automotive business, that he knew of "no instance in which ei-

ther a competently managed existing dealer or a new dealer has been forced out of business because of the division of a Jeep market between such dealers."

In light of all of the evidence, the Court concludes that the implicit presumption of bad faith contained in § 46.1–547(d) cannot be rationally supported. While it may well be that additional dealerships are sometimes established in bad faith, the oversimplified test of § 46.1–547(d) fails to distinguish between additional dealerships so established and those which are established in good faith. Indeed, as the instant case shows, the good faith of a manufacturer in granting a new franchise is no defense under the statute if the Commissioner finds reasonable evidence that the market will not support all of the dealerships in the trade area after the grant of the additional franchise.

It is thus inevitable that § 46.1–547(d) will sometimes prohibit manufacturers from adding dealerships in good faith simply because the Commissioner believes that the market will not bear an additional franchise. In the Court's view, this amounts to nothing less than the repression of competition on grounds that the trade area is "already being adequately served" and that the establishment of an additional franchise will lead to "destructive competition." Such a result is impermissible under the Commerce Clause.

More importantly, by sometimes barring additional dealerships which manufacturers seek to add in good faith, the statute sweeps more broadly than its stated objective of protecting Virginia automobile dealers against unfair practices by automobile manufacturers. In light of this, *A & P v. Cottrell* mandates that the Court inquire "whether adequate and less burdensome alternatives exist." 424 U.S. at 373, 96 S.Ct. at 929.

The statute apparently seeks to prevent two different unfair practices. The first unfair practice is the deliberate overloading of a trade area with dealerships to the end that the manufacturer may pick and choose which dealers to terminate. The second is the setting up of "sweetheart" dealerships in which the manufacturer favors a new dealer in order to push an established dealer out of business.

In the Court's view, the Commonwealth of Virginia can deal with the problem of deliberate overloading of a trade area with dealerships without resort to the burdensome provisions of § 46.1–547(d). The State need only prohibit any manufacturer from assigning aggregate minimum sales requirements in a trade area in excess of the manufacturer's good faith projections for sales in that particular trade area. For example, if there is one dealer in a trade area and the manufacturer projects total sales of 60 vehicles in that area, the manufacturer may not set that dealer's minimum sales requirement above that number. If the manufacturer decides to establish an additional dealership in the same trade area, he could be required to adjust the minimum sales requirement of the existing dealer so that the total minimum sales requirements for the older dealership and the new dealership do not exceed 60 vehicles. Each of the two dealers might be assigned a minimum sales requirement of 30, for example. The manufacturer could be prohibited from assigning a minimum sales requirement of 40 to each dealer until the total good faith projected sales for the trade area reached 80 vehicles. This prohibition would accomplish the State's objective of preventing automobile manufacturers from deliberately overloading trade areas in order to terminate dealers at will.[2]

2. Needless to say, the State may question the good faith of the manufacturer's sales projections for a given trade area. However, if the manufacturer has used a consistent national formula, as in the instant case, then such inquiry must be limited to determining whether this formula has some reasonable basis in historical fact. Unless the manufacturer's sales projections are so shamelessly at odds with experience that they indicate bad faith, the method of calculation must be left to the manufacturer. Otherwise, the State rather than the manufacturer would become the judge of whether a given trade area was "already being adequately served." That is impermissible. *H. P. Hood & Sons v. Du Mond, supra; Buck v. Kuykendall, supra.*

The Court is also of the view that the State can deal with the potential problem of "sweetheart" dealerships by means less sweeping than § 46.1–547(d). When a manufacturer establishes an additional dealership in a trade area, the State can insist that the manufacturer continue to treat the existing dealership fairly. Of course, some differences in treatment between a new dealer and a more experienced dealer can be expected. But if the new dealer receives significantly more favorable treatment than the older dealer, the State may require the manufacturer to show that any such differences in treatment can be rationally explained and are not intended to force the older dealer out of business. Such a statutory scheme would attack the problem of "sweetheart" dealerships without placing obstacles in the way of good faith new dealerships.

■ Finally, parallel to the scheme of the Federal Act, the State of course possesses power to prohibit the establishment of additional dealerships as devices to coerce or intimidate existing dealers. It thus appears to the Court that all of the State's objectives regarding the prevention of unfair trade practices against motor vehicle dealers could be accomplished with a lesser burden on interstate commerce than that imposed by § 46.1–547(d).

In conclusion, the Court holds that (1) the preservation of competition is not a legitimate local purpose under the Commerce Clause; and (2) the prevention of unfair trade practices is a legitimate local purpose, but this purpose could be accomplished with a much lesser burden on interstate commerce. The Court therefore finds that § 46.1–547(d) is unconstitutional under the test enunciated in *A & P v. Cottrell.*

Policy considerations strongly support the Court's conclusion. The shape of American commerce has been transformed by the proliferation of all types of chain and franchise business operations. Motels, drug stores, fast food restaurants, ice cream shops, variety and department stores, tire dealers and numerous other businesses frequently operate under the franchise system. If Virginia were permitted to utilize § 46.1–547(d) to keep additional motor vehicle franchises out of areas of high unemployment and slow population growth, it could enact similar statutes to bar all types of additional franchises from what it views to be economically weak markets. Under such circumstances, the State, rather than the marketplace, would become the arbiter of the appropriate level of competition in each franchised industry. And if Virginia could constitutionally do this, so could every other state. The end result would be the kind of restrictive and segmented economy which the Commerce Clause was specifically intended to prohibit. *See H. P. Hood & Sons v. Du Mond, supra,* 336 U.S. at 538–39, 69 S.Ct. 657.

As the resolution of the plaintiff's remaining constitutional challenges to § 46.1–547(d) is unnecessary to appropriate adjudication of the instant case, the Court refrains from deciding any constitutional issues other than those raised under the Commerce Clause. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

An appropriate order shall issue.