[Civ. No. 15893. Third Dist. Mar. 1, 1979.]

CHRYSLER CORPORATION, Plaintiff and Respondent, v.
NEW MOTOR VEHICLE BOARD, Defendant and Appellant.

COUNSEL

Evelle J. Younger and George Deukmejian, Attorneys General, and Stephen J. Egan, Deputy Attorney General, for Defendant and Appellant.

Crow, Lytle, Gilwee, Donaghue, Adler & Weninger and James R. McCall as Amici Curiae on behalf of Defendant and Appellant.

McCutchen, Black, Verleger & Shea, Franklin H. Wilson, Kerry M. Kinney and David M. Danny for Plaintiff and Respondent.

## OPINION

**PARAS, J.**—This litigation is concerned with certain legislation regarding automobile dealers and dealerships (Veh. Code, §§ 3000-3069)[1] which became operative on July 1, 1974. In pertinent part, it provides that any

---

[1] Section references henceforth are to the Vehicle Code, unless otherwise noted.

existing automobile dealer may prevent the establishment or relocation of additional dealerships in the "same line-make" within 10 miles of his dealership (§§ 3062, 507), initially by protesting, and thereafter by proving to the New Motor Vehicle Board (Board) that there is "good cause not to enter into a franchise establishing or relocating an additional motor vehicle dealership" (§ 3066).

On December 23, 1975, as required by section 3062, Chrysler Corporation notified the Board and Vandenberg Motors of its intention to franchise a new Chrysler-Plymouth dealership in Sacramento County, to be operated by Lew Williams and Frank Hurling at 2329 Fulton Avenue, within 10 miles of Vandenberg's existing Chrysler-Plymouth dealership.

On December 29, within the 15 days permitted by section 3062, Vandenberg Motors filed a protest with the Board.[2] As required by section 3062, the Board on December 30 notified Chrysler not to establish the new dealership until the Board held a "good cause" hearing.

On January 13, 1976, Chrysler filed suit in the Sacramento County Superior Court seeking to enjoin the Board from interfering with its establishment of the new dealership. On March 26, the court granted Chrysler a preliminary injunction, stating that there was "a strong likelihood that the pertinent statutes are unconstitutional . . . ." Shortly thereafter, the prospective dealership (Lew Williams Chrysler-Plymouth) was licensed by the Department of Motor Vehicles and began operations.

The Board appeals from the order granting the preliminary injunction.

After the briefs were filed herein, we held in *American Motor Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983 [138 Cal.Rptr. 594], that the mandated presence of four dealers on the Board rendered it an unconstitutionally biased tribunal for the adjudication of disputes between dealers and manufacturers. The Legislature reacted to our holding by amending sections 3010, 3050, and 3066, subdivision (d), effective July 8, 1977, to provide that "[n]o member of the board who is a new motor vehicle dealer may participate in, deliberate on, hear or consider, or decide, any matter involving a protest . . . ."

---

[2]John B. Vandenberg, president of Vandenberg Motors, was and is a member of the Board. However, upon filing his protest, Vandenberg withdrew from all Board matters involving Chrysler. As we shall see, after our opinion in *American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983 [138 Cal.Rptr. 594], the Legislature amended Vehicle Code sections 3010, 3050 and 3066, to make such nonparticipation mandatory.

Thereafter on September 14, 1977, a three-judge Los Angeles federal district court, in *Orrin W. Fox Co.* v. *New Motor Veh. Bd., etc.* (C.D.Cal. 1977) 440 F.Supp. 436, held that the ability of a dealer "by the simple means of filing a protest" (*id.,* at p. 438) to prevent a new competitor from becoming established until a hearing is held, is a "gross violation of the Due Process Clause of the Fourteenth Amendment." (*Id.,* at p. 440.) The court enjoined the Board from enforcing the protest provisions of the legislation. However, on December 5, 1978, the United States Supreme Court reversed the district court (*New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.* (1978) 439 U.S. 96 [58 L.Ed.2d 361, 99 S.Ct. 403]).

We requested and received supplemental briefs, and after perusing them requested and received a second set of supplemental briefs, directed to whether the legislation violates the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) or the commerce clause of the United States Constitution (art. I, § 8, cl. 3).

I

REVERSAL FOR MOOTNESS

Amici Curiae[3] argue that the Legislature's removal of dealer-members from protest hearings has mooted the major ground upon which the superior court granted the preliminary injunction (i.e., that the Board was a biased tribunal), and therefore the injunction should be reversed summarily. We disagree. ■ It is well settled that decisions of trial courts must be affirmed if legally correct, regardless of their stated reason. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

II

EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ The Board argues in its supplemental brief that the trial court had no jurisdiction to grant Chrysler relief because Chrysler failed to exhaust its administrative remedies. However, the administrative procedures which the Board claims Chrysler should have exhausted were not Chrysler's remedy; they are the very source of the asserted injury for

---

[3]Northern California Motor Car Dealers Association and Motor Car Dealers Association of Southern California.

which Chrysler sought a remedy. Thus Chrysler comes within a well-recognized exception to the exhaustion rule, where the administrative remedy is inadequate (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 342-343 [124 Cal.Rptr. 513, 540 P.2d 609]; *Gibson* v. *Berryhill* (1973) 411 U.S. 564, 574-575 [36 L.Ed.2d 488, 497-498, 93 S.Ct. 1689]), or the challenge is to the constitutionality of the administrative agency itself or the agency's procedure (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 251 [115 Cal.Rptr. 497, 524 P.2d 1281]).

## III

### BIASED TRIBUNAL

Chrysler observes that "The Board's new motor vehicle dealer members do continue to sit on hearings on petitions by dealers to review dealer licensing decisions of the DMV. Whether the veil drawn between the Board's public members and its new motor vehicle dealer members sitting in different types of proceedings will pass constitutional muster remains an open question. It is sufficient for the purposes of this case that Chrysler did not, in fact, have available to it a constitutionally required impartial tribunal at the time it sought and obtained a preliminary injunction."

The contention is technically sound, for the validity of an order or judgment should normally be determined as of the time it is issued. ██ Yet considerations of judicial economy, procedural efficiency, and fundamental justice dictate that at least in certain cases, of which this is one, an appellate court should rule and dispose "in accordance with the law existing at the time of its own decision, even though it led to a reversal of a judgment which was proper at the time of its rendition [fn. omitted], or the affirmance of one wherein there was error which has since been obviated by a change in the law." (5B C.J.S., Appeal and Error, § 1841, pp. 246-248; see also authorities there cited.)

## IV

### DUE PROCESS

In its original brief, as well as in its supplemental brief, Chrysler challenges the requirement of section 3062 that upon receipt of a protest the Board must prohibit the proposed dealership until after a hearing and

determination of good cause. Chrysler asserts that due process requires a *prior* notice and hearing before the prospective dealer's right to engage in a lawful business can be infringed.

Similar arguments were adopted by the district court, and later rejected by the United States Supreme Court, in the *Orrin W. Fox Co.* case. The issue is thus no longer viable. No useful purpose would be served by any further detailed discussion of the subject in this opinion.

Chrysler's briefs repeatedly emphasize the adverse effects of the Board's "leisurely" hearing schedule, stressing that delay has the practical effect of denial since financial and other commitments cannot be maintained over long periods of time. We are not unsympathetic to the plaint, for the time periods, both limited and unlimited, do not exactly prophesy alacrity. Yet neither are they facially unreasonable, even though they may be a proper subject for further legislative attention. We see no valid distinction between these delays and those inherent in gaining approval of various governmental agencies and boards to use property for such as an industrial plant, a shopping center, and the like. As delay becomes an expectable part of the process, it can be anticipated in financial preparations and thus minimized.

Chrysler suggests that even if its due process rights under the federal Constitution have not been infringed, we ought to construe the California Constitution so as to find such infringement. In support of its argument it states that "California decisions have recognized that 'every individual possesses as a form of property the right to pursue any lawful calling, business or profession he may choose.' *Edwards* v. *Fresno Community Hosp.*, 38 Cal.App.3d 702, 705, 113 Cal.Rptr. 579 (1974). There is also no doubt that this right is one of constitutional dimension. California Constitution, Article I, § 7(a) (1974). In *Purdy & Fitzpatrick* v. *State*, 71 Cal.2d 566, 79 Cal.Rptr. 77, 456 P.2d 645 (1969), the California Supreme Court declared: '. . . [T]he state may not arbitrarily foreclose to any person the right to pursue an otherwise lawful occupation. Any limitation on the opportunity for employment impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness; courts sustain such limitations only after careful scrutiny.' 71 Cal.2d at 579."

*Edwards* involved a doctor whose *existing* hospital use privileges had been curtailed, and was concerned solely with determining statute of limitation issues. *Purdy & Fitzpatrick* held that a rule prohibiting resident

aliens from employment on public works violates equal protection, not due process. They do not apply here, for the statutes do not prohibit the pursuit of a business; they regulate it. Chrysler does not contend that the State has no right to license automobile dealers or to impose zoning and other regulations upon the sale and manufacture of automobiles. Indeed, its supplemental brief emphasizes the myriad of applicable regulations. Its argument appears to be that having complied with all such regulations, its efforts should not ". . . be indefinitely rendered naught at the whim of a competing dealer. It is at that point that due process breaks down."

We cannot agree. If the state may limit, or even prohibit, certain dealers or dealerships by various regulations, it is not apparent how the additional regulations in section 3062 become a "straw that breaks the camel's back." ■ A statute merely requiring board approval to establish a new dealership (with no requirement of a protest from an existing dealer), doubtless would not offend due process; for such a statute does not differ in effect from licensing, zoning and environmental impact regulations. The fact that the challenged statute requires board approval only when another dealer protests does not give Chrysler any less due process. The wisdom of this condition is of course not for us to judge.

## V

### COMMERCE CLAUSE

A Virginia statute similar to the California legislation was recently held unconstitutional under the commerce clause of the United States Constitution in *American Motors Sales* v. *Div. of Motor Vehicles* (E.D. Va. 1978) 445 F.Supp. 902. The Virginia law provided that no additional dealerships could be established if the commissioner of the division of motor vehicles determined, after a hearing, *"that there is reasonable evidence that after the grant of the new franchise, the market will not support all of the dealerships in that line-make in the trade area; . . ."* (445 F.Supp. at p. 904. Italics in original.) The federal district court held that the statute "amounts to nothing less than the repression of competition on grounds that the trade area is 'already being adequately served' and that the establishment of an additional franchise will lead to 'destructive competition.' Such a result is impermissible under the Commerce Clause." (*Id.,* at p. 910.) The court added that "Under such circumstances, the State, rather than the marketplace, would become the arbiter

of the appropriate level of competition in each franchised industry. And if Virginia could constitutionally do this, so could every other state. The end result would be the kind of restrictive and segmented economy which the Commerce Clause was specifically intended to prohibit." (445 F.Supp. at p. 911.)

However, after this decision the United States Supreme Court decided *Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117 [57 L.Ed.2d 91, 98 S.Ct. 2207] which compels the conclusion that the district court erred and that the California law does not violate the commerce clause. In *Exxon* the court confronted a Maryland statute requiring oil producers and refiners to close all their company-operated service stations in Maryland and to sell oil and gasoline exclusively through independent retailers. The oil companies argued inter alia that the statute (1) discriminated against interstate commerce, and (2) unduly burdened interstate commerce. (437 U.S. at p. 125 [57 L.Ed.2d at p. 99].)

The Supreme Court rejected the discrimination argument on the ground that since all petroleum products are produced and refined outside Maryland, there was no discrimination in favor of local *refiners*.[4] And the statute did not discriminate in favor of local *dealers,* because interstate dealers were free to operate as retailers in Maryland (as long as they were not also refiners). (437 U.S. at pp. 125-126 [57 L.Ed.2d at p. 100].) Said the court: "If the effect of a state regulation is to cause local goods to comprise a larger share, and goods with an out-of-state source to comprise a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce. But the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods. The sales by independent retailers are just as much a part of the flow of interstate commerce as the sales made by the refiner-operated stations." (437 U.S. at pp. 126-127, fn. 16 [57 L.Ed.2d at p. 100].)

But since the effect of the statute fell exclusively upon refiners, all of whom operated interstate, the refiners argued that the statute impermissibly *burdened* interstate commerce. They pointed to evidence in the record that at least three refiners would stop selling in Maryland and that the elimination of company-operated stations would deprive the consumer of

---

[4]Presumably the result would not be different even if some petroleum products were produced locally in Maryland, because the statute discriminated even-handedly against *all* producers, local and interstate.

certain special services. The Supreme Court rejected the burden argument, reasoning that "Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another. [¶] The crux of appellants' claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered 'with the natural functioning of the interstate market either through prohibition or through burdensome regulation.' *Hughes* v. *Alexandria Scrap Corp.* 426 U.S. 794, 806 [49 L.Ed.2d 220, 96 S.Ct. 2488]. Appellants then claim that the statute 'will surely change the market structure by weakening the independent refiners . . . .' [Fn. omitted.] We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. See *Breard* v. *Alexandria,* 341 U.S. 622, . . . As indicated by the Court in *Hughes,* the Clause protects the interstate firms, from prohibitive or burdensome regulations. It may be true that the consuming public will be injured by the loss of the high volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce." (437 U.S. at pp. 127-128 [57 L.Ed.2d at p. 101].)

The reasoning in *Exxon* is directly applicable here. ■ California restrictions on the establishment of new motor vehicle dealerships operate even-handedly against all motor vehicle manufacturers, whether the motor vehicles are manufactured in California or elsewhere. Thus there is no *discrimination* in favor of local manufacturers or dealers or against interstate manufacturers or dealers. And the *burden* on interstate commerce is exactly the same here as in *Exxon;* there may be some switching from one interstate supplier to another, and there probably will be a fewer number of dealerships established than would otherwise be the case. But there is no reason to assume that the flow of interstate motor vehicles into California will be lessened thereby. Existing dealers will simply sell more vehicles.

In its second supplemental brief, Chrysler takes issue with such assumptions, pointing to declarations in the record that it would lose not less than 600 new vehicle sales in the year 1976 if it could not enter into a

new dealership in northern Sacramento. But this is no burden on interstate commerce. Those 600 sales presumably were made up by other manufacturers, or what is perhaps equally likely, were or will be recouped sooner or later by other Chrysler dealers in other areas who gain a competitive edge because competing manufacturers are themselves unable to establish or are delayed in establishing new dealerships due to the challenged legislation. Be it remembered that the specific question is one of burden on interstate commerce, not fairness to Chrysler in any given instance.

As in *Exxon,* the ultimate effect of the statute may possibly be to injure the public incidentally by the elimination of some competition. On the other hand, giving dealers greater security against manufacturers may somehow benefit the consuming public in other ways. In any event, as *Exxon* makes clear, such considerations go ". . . to the wisdom of the statute, not to its burden on commerce." (437 U.S. at p. 128 [57 L.Ed.2d at p. 101]; see also *New Motor Vehicle Board of California* v. *Orrin W. Fox Co., supra,* 58 L.Ed.2d 361.)

## VI

### ANTITRUST

In all of its briefs, Chrysler argues that the challenged legislation violates the Sherman Antitrust Act, 15 United States Code sections 1 and 2. This contention was resolved adversely to Chrysler by the United States Supreme Court in the *Orrin W. Fox Co.* case (58 L.Ed.2d 361), and no further discussion by us is appropriate.

The case is remanded to the trial court with instructions to vacate the order granting the preliminary injunction. But inasmuch as the proposed dealership has been in actual operation since the spring of 1976, and will so continue if the Board ultimately finds no cause to reject it, equity requires that it be permitted to remain in operation until the Board renders a final decision. Each party shall bear its own costs on appeal.

Regan, Acting P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied March 29, 1979, and the petitions of both the parties for a hearing by the Supreme Court were denied April 26, 1979.