Commonwealth of Pennsylvania, Department of Transportation, Bureau of Traffic Safety, Appellant v. Glenn E. Slater, Appellee.

Submitted on briefs May 11, 1983, to Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*Harold H. Cramer,* Assistant Counsel, with him *Ward T. Williams,* Chief Counsel, and *Jay C. Waldman,* General Counsel, for appellant.

*Kenneth Levitzky,* for appellee.

OPINION BY JUDGE CRAIG, June 30, 1983:

The Department of Transportation, Bureau of Traffic Safety, appeals an order of the Court of Common Pleas of Bradford County, which reversed the department's decision to revoke the school bus driver's license of Glenn E. Slater, a diabetic.

Slater has had a Class 4 license (school bus driver's license) since 1973. Responding to Slater's physician's report indicating that Slater had diabetes, the department, by letter of October 22, 1980, required Slater to have a doctor complete a general diabetic form issued by the department. On that form, the treating physician[1] indicated that Slater had diabetes for eight years and was taking 500 milligrams of the hypoglycemic drug Dymelor daily. Furthermore, the physician noted that Slater did not adhere to his diet, and that his blood sugar was not within the normal range.

As a result of that diagnosis, the department notified Slater that it was suspending his license, effective December 2, 1980, under sections 1504 and 1509 of The Vehicle Code,[2] requiring that school bus drivers be physically qualified to obtain a license.[3]

---

[1] Dr. John Kirkowski, who had treated Slater for four years, conducted the examination.

[2] 75 Pa. C. S. §§1504 and 1509.

[3] Section 1504, which requires that all persons operating motor vehicles have a license, provides, in relevant part:

(c) *Qualifications of applicants.* — The department shall establish by regulation the qualifications necessary for the safe operation of the various types, sizes or combinations of vehicles and the manner of examining applicants

Specifically, the department suspended Slater under 67 Pa. Code §71.3, a regulation promulgated under the statutory authority of section 1504(c) and 75 Pa. C. S. §1517(b).[4] Section 71.3 provides, in relevant part:

(b) *Requirements of Physical Examination.* The following shall be the minimum requirements for passing a physical examination:

....

(3) No established medical history or clinical diagnosis of:

(i) Diabetes mellitus requiring use of insulin or any other hypoglycemic medication.

Slater appealed his suspension to the common pleas court, which found that Slater's diabetes was well controlled and, by order of July 17, 1981, ruled that the department must restore Slater's driving privileges.

However, after the department had appealed that order, the common pleas court issued an opinion in which it stated that it "should not have considered the evidence relating to the time period subsequent to the Department's recall of Slater's driving privileges," and,

---

to determine their qualifications of the type or general class of license applied for.

Section 1509 provides, in relevant part:

(a) *School bus driver requirements.* —No person shall be issued a Class 4 license unless the person:

....

(2) has satisfactorily passed an annual physical examination to be given by the physician for the school district by which the person is employed....

[4] Section 1517 establishes a medical advisory board and provides:

The board shall formulate rules and regulations for adoption by the department on physical and mental criteria including vision standards relating to the licensing of drivers under the provisions of this chapter.

75 Pa. C. S. §1517(b).

because the only evidence focusing on Slater's condition at the time of the suspension indicated that Slater's diabetes was not well controlled, said that its order of July 17, 1981 should be reversed.

We note, however, that an appeal will lie only from a definitive order, decree or judgment which finally determines the action. *See Stadler v. Borough of Mt. Oliver,* 373 Pa. 316, 95 A.2d 776 (1953). Therefore, we must treat this matter as an appeal from the common pleas court's order dated July 17, 1981, which restored Slater's license.

In appealing that order, the department contends that it is entitled to issue regulations under an express grant of legislative authority, and that section 71.3, although requiring school bus drivers to meet much higher standards than ordinary drivers, is reasonable, considering the tragedy that could occur if the operator of a school bus lost consciousness.

In response, Slater asserts that section 71.3: (1) conflicts with the legislative intent expressed in 75 Pa. C. S. §1509; and (2) violates the Fourteenth Amendment of the United States Constitution because it serves no rational legislative purpose, unduly oppresses a specific class of individuals, and establishes an irrebuttable presumption of physical unfitness.

### Statutory Compliance

In resolving Slater's first contention, we must first review *Bureau of Traffic Safety v. Byrd,* 41 Pa. Commonwealth Ct. 38, 399 A.2d 425 (1979), where we considered a regulation which categorized certain physical conditions as automatic disqualifications for a Class 4 license.[5] The department had promulgated that regulation under section 609 of the former Vehicle

---

[5] *See Id.* at 43-44, 399 A.2d at 425.

Code[6] which, like present section 1509, generally provided that no person could legally operate a school bus unless he "has satisfactorily passed a physical examination.... "

Our holding in *Byrd*, that a department regulation which declared that a history of myocardial infarction alone, absolutely and without exception, disqualified any person from legally driving a school bus, exceeded the department's legislative authority to require that school bus drivers pass annual physical exams, rested on our crucial determination that:

> No express authorization exists under the 1959 Vehicle Code for the Department to promulgate regulations implementing Section 609 above.

*Id.* at 41, 399 A.2d at 426.

However, as we noted in *Byrd*,[7] the legislature repealed the 1959 Vehicle Code and reenacted the current Vehicle Code,[8] which became effective on July 1, 1977. Thus, we decided *Byrd* under the 1959 Code; here, however, we must consider the validity of section 71.3 under the current Code.

Section 1504 of the current Code[9] grants the department express authority to promulgate regulations to establish "the qualifications necessary for the safe operation of various types, sizes or combinations of vehicles and the manner of examining applicants to determine their qualifications for the type or general class of license applied for." Furthermore, 75 Pa. C. S. §1517 in the current Code formally establishes a Medical Advisory Board and provides that "[t]he board shall formulate rules and regulations for adoption by

---

[6] Act of April 29, 1959, P.L. 58, *formerly* 75 P.S. §609, repealed by the Act of June 17, 1976, P.L. 162.

[7] *Id.* at 41, n. 2, 399 A.2d at 426.

[8] 75 Pa. C. S. §§101-3368.

[9] 75 Pa. C. S. §1504.

the department on physical and mental criteria ... relating to the licensing of drivers under the provisions of this chapter." 75 Pa. C. S. §1517(b). Thus, in contrast to *Byrd*, under the current code, the department has express authority to promulgate regulations implementing section 1509.

As in *Byrd*, we find instructive our Supreme Court's decision in *Uniontown Area School District v. Pennsylvania Human Relations Commission*, 455 Pa. 52, 313 A.2d 156 (1973). There the court quoted Professor Davis, an administrative law expert, in discussing the difference between a regulation promulgated under an agency's interpretive rule-making powers (the *Byrd* situation) and one promulgated under an express grant of legislative power (the present situation). *Id.* at 76-78, 313 A.2d at 169.

Slater contends, however, that 75 Pa. C. S. §1519, which authorizes the department to order a physical examination of any licensee who appears to be physically or mentally unqualified, and to "recall the operating privileges of any person whose incompetency has been established," indicates a legislative intent to disqualify drivers only when they are suffering from a current disability. Thus, Slater argues that, notwithstanding the fact that the department promulgated section 71.3 under express legislative authority, that regulation has no force because it conflicts with other statutes, particularly section 1519.

However, we find no inconsistency between the legislature's grant of authority to the department to define physical qualifications, and to remove drivers who fail to meet those qualifications. Therefore, the distinction between legislative and interpretive rule-making, discussed in *Uniontown Area School District*, is controlling, and we must treat section 71.3 as having effect like that of a statute. Accordingly, we cannot say that this regulation is in conflict with the

general statutory framework to which we were confined in our analysis in *Byrd*.

CONSTITUTIONAL CHALLENGE

*Standard of Review*

As in all cases involving equal protection challenges, this court must decide the appropriate standard for reviewing the constitutionality of section 71.3. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287 (1973), reaffirmed that equal protection analysis requires strict scrutiny of the legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right[10] or operates to the peculiar disadvantage of a suspect class.[11]

In cases where these considerations are absent, the government action will be upheld if the means employed are rationally related to the end to be achieved. *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939 (1979); *Kacar, Inc. v. Zoning Hearing Board of Allentown*, 60 Pa. Commonwealth Ct. 582, 432 A.2d 310 (1981). Thus, this court initially must determine whether the department's suspension of the applicant's school bus driver's license, which causes the applicant to lose his present job, deprives the applicant of a fundamental right.

---

[10] *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705 (1973) (right of a uniquely private nature); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849 (1972) (right to vote); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322 (1969) (right of interstate travel); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5 (1968) (rights guaranteed by the First Amendment); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110 (1942) (right to procreate).

[11] *See, e.g., Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848 (1971) (alienage); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283 (1964) (race).

In *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589 (1971), the Supreme Court, in holding that a driver is entitled to a hearing before a state can revoke his license, said:

> Once licenses are issued, as in [the driver's] case, their continued possession may become essential to the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases, the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. (Citations omitted.) This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a "right" or a "privilege." (Citations omitted.)

This court has recognized that driver's "operating privileges are protectable property interests that may not be terminated without the procedural due process required by the fourteenth amendment," *Bureau of Traffic Safety v. Quinlan*, 47 Pa. Commonwealth Ct. 214, 218, 408 A.2d 173, 175 (1979), although we earlier had implied that a license approximates a privilege more than a right.... " *Bureau of Traffic Safety v. Abraham*, 7 Pa. Commonwealth Ct. 535, 300 A.2d 831 (1973). Furthermore, in *Commonwealth v. Quarles*, 229 Pa. Superior Ct. 363, 378, n.5, 324 A.2d 452, 461 (1974), our Superior Court, in holding that the implied consent law (person who operates motor vehicle is deemed to have given his consent to a breathalyzer test) does not authorize the administration of a breathalyzer test on "reasonable grounds" if unaccompanied by a legal arrest, noted:

> It is hard to accept the continued characterization of a license to drive as a

privilege. "No one will deny that we have reached a time in our modern way of life when the motor vehicle has clearly become a necessity to many people. The very livelihood of many, such as chauffeurs, truckers, traveling salesmen, men who work in skilled or unskilled labor, depends upon the operation of a motor vehicle. Their drivers' licenses are just as valuable as a license to engage in an occupation or profession." (Citation omitted.)[12]

The evolution of an operator's license from a mere privilege is based on recognition that a license is often a prerequisite in conducting one's employment. However, insofar as the Supreme Court has said that a right of employment is not fundamental, *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 158, 427 U.S. 307 (1976), we cannot say that the loss of one's school bus driver's license is equivalent to the loss of a fundamental right. In *Murgia*, the Court noted that "a standard less than strict scrutiny 'has consistently been applied to state legislation restricting the availability of employment opportunities.'" 427 U.S. at 315, 96 S.Ct. at 2567. Likewise, in *McCoy v. State Board of Medical Education and Licensure*, 37 Pa. Commonwealth Ct. 530, 541, 391 A.2d 723, 728 (1978) (en banc), we said:

In equal protection challenges to state limitations on employment opportunities and state licensing, the [Supreme] Court has consistently applied the rational basis test in determining the constitutionalilty of the state's classification. (Citations omitted.) These cases recognize that there is no fundamental right to employment in general ... Thus, we deem the proper standard

---

[12] *But cf. In Re Hamsher Motor Vehicle Operator License Case*, 196 Pa. Superior Ct. 336, 175 A.2d 303 (1961) (court, in pre-Bell decision, held that because an operator's license is a privilege, the constitutional requirements of due process are far less stringent).

to be applied is whether the classification bears some rational relationship to a permissible state objective. (Citation omitted.)

Therefore, concluding that the possession of a Class 4 license is not a fundamental right, we cannot subject Section 71.3 to the degree of critical examination required under the strict scrutiny test.

### Application of Rational Basis Test

We turn then to examine the regulation under the rational basis standard. This inquiry employs a more general standard reflecting the Supreme Court's awareness that the drawing of lines which ·create distinctions is peculiarly a legislative task and an unavoidable one, and that perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1162 (1970).

Here, the department asserts that the regulation is rational because "persons with certain physical conditions represent an increased safety risk; a risk that should not be tolerated, given ·the highly increased potential for tragedy, should a school bus accident occur."

Slater has presented no evidence to refute the underlying assumption of section 71.3(b) that persons with a medical history or clinical diagnosis of diabetes mellitus, requiring use of insulin or other hypoglycemic medication, represent a class of individuals susceptible to health risks greater than that found in the average population, which would render them relatively unsafe to drive school buses. Rather, the applicant emphasizes that the regulation creates an irrebuttable presumption that all drivers who meet the regulation's classification represent a safety hazard to school children.

Before addressing the irrebuttable presumption issue, we note that classifications by a legislature,

when examined under the rational basis standard are presumed to be valid, *Massachusetts Board of Retirement v. Murgia*, and that "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949 (1979). Thus, the government need not present "empirical proof," *Id.* at 110, 99 S.Ct. at 949, or "factual support for [its] assumption." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499 (1976).[13] *See also Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340 (1911). Thus, absent any refutation by Slater, we cannot say that the department's method of ensuring particularly safe schoolbus drivers is irrational.

### Irrebuttable Presumption

Slater asserts that section 71.3 creates an irrebuttable presumption that all diabetic persons classified by the regulation present potential safety hazards to school children, and claims that the department, by failing to afford him a hearing to rebut this presumption, has deprived him of his constitutional rights under the Fourteenth Amendment.

The recent history of the doctrine of irrebuttable presumption emanates from a series of Supreme Court decisions from 1971 to 1974. *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586 (1971); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208 (1972); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230 (1973); *United States Department of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832

---

[13] "The State is not compelled to verify logical assumptions with statistical evidence." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. at 812, 96 S.Ct. at 2499.

(1973); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791 (1974).[14]

Each of these cases involved a statute which denied a benefit or placed a burden on all individuals possessing a certain characteristic, constituting that characteristic as the basic fact from which a presumed fact is inferred. Essentially, these decisions held that if it "is not necessarily or universally true in fact" that the basic fact implies the presumed fact, *Vlandis v. Kline*, 412 U.S. at 452, 93 S.Ct. at 2236, then the statute's irrebuttable presumption denies due process of law.[15]

These five decisions, which have employed the irrebuttable presumption analysis, can be divided into two categories.

The first category contains *Stanley v. Illinois* and *Cleveland Board of Education v. LaFleur*. In both

---

[14] These decisions can be traced to *Heiner v. Donnan*, 285 U.S. 312, 52 S.Ct. 358 (1932), where the Court considered a constitutional challenge to a federal statute that created a conclusive presumption that gifts made within two years before the donor's death were made in contemplation of death, thus requiring payment by his estate of a higher tax. In holding that this irrefutable assumption was so arbitrary and unreasonable as to deprive the taxpayer of his property without due process of law, the Court stated that it had "held more than once that a statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the Fourteenth Amendment." *Id.* at 329, 52 S.Ct. at 362. The Court cited *Heiner* in *Vlandis v. Kline*, 412 U.S. 441, 446, 93 S.Ct. 2230, 2233 (1973) to support the proposition that the statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments. In that opinion, Justice REHN-QUIST, in dissent, said that *Heiner* "harks back to a day when the principles of substantive due process had reached their zenith in this Court. Later and sounder cases thoroughly repudiated these principles in large part," citing *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028 (1963). *Id* at 467-68, 93 S.Ct. at 2244.

[15] *See* Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv. L. Rev. 1534, 1534-36 (1974).

cases, the Court noted that the procedures implicated fundamental interests of the affected individuals. In *Stanley v. Illinois*, the Court condemned the impairment of the parental rights of an unwed father by a presumption of unfitness, and in *Cleveland Board of Education v. LaFleur*, the Court struck down regulations requiring mandatory maternity leave for school teachers, noting that "freedom of personal choice in matters of marriage and family is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." 414 U.S. at 639-40, 94 S.Ct. at 796 (citations omitted).

The second category, which includes *Bell v. Burson*, *Vlandis v. Kline* and *United States Department of Agriculture v. Murry*, did not involve situations where one's fundamental rights were involved. In *Bell*, the Court held that a Georgia procedure which mandated revocation of a driver's license if he was involved in an accident, had no liability insurance, and failed to post cash or bond in the amount of the claimant's alleged damages, violated the due process clause because the procedure implied a general presumption that uninsured drivers, involved in accidents, will be held liable for those accidents. Thus, revocation of the license before the finding of negligence adjudicated important interests of the licensees. The Court emphasized that the procedure classified an individual driver as negligent even when "there is *no reasonable possibility* of a judgment being rendered against the licensee.... " 402 at 540, 91 S.Ct. at 1590 (emphasis added). Thus, the Court implicitly determined that the procedure lacked a rational relationship to the designated objective.

In *Vlandis*, the Court examined a Connecticut statutory presumption that all out-of-state applicants to state colleges were nonresidents for purposes of calculating tuition and would remain nonresidents for

as long as they were students in Connecticut. The Court held that the statute violated the due process clause, and said:

> The State's objective of cost equalization between bona fide residents and nonresidents may well be legitimate, but basing the bona fides of residency solely on where a student lived when he applied for admission to the University is using a criterion wholly unrelated to that objective. As is evident from the situation of the appellees, a student may be a bona fide resident of Connecticut even though he applied to the University from out of State. Thus, Connecticut's conclusive presumption of nonresidence, instead of ensuring that only its bona fide residents receive their full subsidy, ensures that certain of its bona fide residents, such as the appellees, do *not* receive their full subsidy, and can never do so while they remain students.

*Vlandis v. Kline*, 412 U.S. at 448-49, 93 S.Ct. at 2234-2235.

In *Murry*, the Court held invalid a welfare payment qualification that denied food stamps to any household in which one or more persons over eighteen years of age had been claimed as a dependent on a federal income tax return filed within the preceding two years by taxpayers who were themselves ineligible to receive food stamps. The Court determined that the provision had no relation to the actual need of the persons affected, and concluded that "the deduction taken for the benefit of the parent in the prior year is *not a rational measure* of the need of a different household with which the child of the tax-deducting parent lives.... " 413 U.S. at 514, 93 S.Ct. at 2836 (emphasis added). Once again, the Court used the rational basis analysis.

The Supreme Court, however, in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457 (1975), limited its application of the irrebuttable presumption doctrine in equal protection cases that did not involve fundamental rights. In an opinion by Mr. Justice REHNQUIST, the Court upheld a provision in the Social Security Act prohibiting a wage earner's widow or stepchild from receiving insurance benefits unless their relationships to the wage earner existed nine months before his death, and distinguished the Court's application of the irrebuttable presumption doctrine in *Stanley* and *LaFleur* on the ground that those cases "involve[d] affirmative Government action which seriously curtail[ed] important liberties cognizable under the Constitution." 422 U.S. at 785, 95 S.Ct. at 2476.

Furthermore, in analyzing the application of the irrebuttable presumption doctrine in cases not involving fundamental rights, the Court noted that its earlier decisions, including *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367 (1960); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153 (1970); and *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254 (1971), employed the rational basis test without using the irrebuttable presumption doctrine. The Court, after a lengthy discussion, implied that where the rational basis test applied, application of the irrebuttable presumption doctrine was inappropriate, saying:

> Under [the standards expressed in Dandridge v. Williams and Richardson v. Belcher], the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in [Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93

S.Ct. 1652 (1973)] Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.
422 U.S. at 777, 95 S.Ct. at 2472-73.[16]

Indicative of the difficulty in applying the irrebuttable presumption doctrine in situations where a court applies the rational basis test, Mr. Justice BRENNAN, dissenting in *Weinberger v. Salfi*, criticized the majority's method of distinguishing the Court's earlier decision in *Vlandis*:

---

[16] In *Mourning*, the Court sustained the constitutionality of a regulation promulgated under the Truth In Lending Act which made the Act's disclosure provisions applicable whenever credit is offered to a consumer for which a finance charge is or may be imposed or which, pursuant to an agreement, is or may be payable in more than four installments.

*See also, Department of Public Welfare v. Molyneaux*, 498 Pa. 192, 445 A.2d 730 (1982), where our Supreme Court, citing *Weinberger v. Salfi*, held that a provision of the Social Security Act establishing only two classes of dependent children eligible for aid to families with dependent children, those who are deprived of parental support or care by reasons of the death, continued absence from home or physical or mental incapacity of a parent, and those who are deprived of parental support or care by reason of the unemployment of one of their parents, thereby excluding those who had an employed parent and caretaker parent present in the household, was constitutional under rational basis test. The court specifically held that application of the irrebuttable presumption doctrine was inappropriate.

Since the Court cannot dispose of Vlandis as it does Stanley and LaFleur, it attempts to wash away Vlandis by noting that "where Connecticut purported to be concerned with residency, it might not at the same time deny to one seeking to meet its test of residency the opportunity to show factors clearly bearing on that issue." [Quoting majority's opinion at 422 U.S. at 772, 95 S.Ct. at 2470].

Yet, the Connecticut statute in Vlandis did not set "residency," undefined, as the criteria of eligibility; it *defined* residency in certain ways. The definitions of "resident" were precisely parallel to the statute here, which defines "widow" and "child" in part by the number of months of marriage. (Citation omitted.)

*Id.* at 803, 95 S.Ct. at 2485 (BRENNAN, J., dissenting).[17]

---

[17] *Compare Matter of Estate of Cavill*, 459 Pa. 411, 329 A.2d 503 (1974) (opinion by ROBERTS, J.) (POMEROY, J. dissenting) and *Stottlemyer v. Stottlemyer*, 458 Pa. 503, 329 A.2d 892 (1974) (opinion by POMEROY, J.) (ROBERTS, J., dissenting). These cases, decided on the same date, seem to use different interpretations of *Vlandis v. Kline*, although neither majority opinion applied the irrebuttable presumption doctrine.

In *Cavill*, the court held that a statute invalidating a bequest in a will to religious and charitable organizations made within thirty days of the testator's death denied the charitable beneficiaries equal protection of the law. Employing the rational basis test, the court said:

> Because the statute sweeps within its prohibition many testamentary gifts which present no threat of the evils which the statute purports to minimize, it is substantially over-inclusive. Since the statute also leaves unaffected many gifts which do present such a threat, it is also substantially under-inclusive. We are thus compelled to conclude that it lacks "a fair and substantial relation" to the legislative object.

459 Pa. at 417, 329 A.2d at 506.

Shortly after *Weinberger v. Salfi*, the Court applied the irrebuttable presumption doctrine in *Turner v. Department of Employment Security and Board of Review*, 423 U.S. 44, 96 S.Ct. 249 (1975). In finding that the Utah statute making pregnant women ineligible for unemployment benefits for the period extending from twelve weeks before the expected date of child-

---

In dissent, Mr. Justice POMEROY noted that the majority had concluded that the statutory classification was irrational because it was both over-inclusive and under-inclusive, and said:

> I find this rationale wholly untenable; under the guise of the traditional rational basis test, the Court has, in fact, applied the "strict scrutiny" standard demanded only in those instances where a suspect classification or a fundamental right is at stake.

*Id.* at 422, 329 A.2d at 509.

Furthermore, Mr. Justice POMEROY distinguished *Stanley v. Illinois, Cleveland Board of Education v. LaFleur, Bell v. Burson* and *Vlandis v. Kline*, as instances where:

> [T]he petitioner possessed a clear right of liberty or property which had been summarily extinguished by the state ... Whatever the meaning of "irrebuttable presumption," it is not, without more, a constitutionally significant phrase. Our attention must focus first on the existence or non-existence of a constitutionally protected interest.

*Id.* at 426, 329 A.2d at 511.

In Contrast, in *Stottlemyer*, the court held that the one-year residency requirement in a divorce action did not violate a spouse's right to equal protection. The court applied the rational basis test, relying, in part, on the Supreme Court's application of that test in *Vlandis*. However, although citing *Vlandis* for the proposition that presumptions relating to reasonable residency requirements could be permissible, the court declined to apply the irrebuttable presumption doctrine, and, instead, applied only the rational basis test, holding that the classification was rational.

Mr. Justice ROBERTS, in dissent, concluded that the right to a divorce was fundamental and suggested that the court apply the strict scrutiny test. In so doing, he urged the court to find that the statute created an irrebuttable presumption, citing *Stanley v. Illinois. Stottlemeyer v. Stottlemeyer*, 458 Pa. at 534, 329 A.2d at 829.

birth until a date six weeks after childbirth unconstitutional, the Court emphasized that the presumption of incapacity and unavailability for employment created by the challenged provision was virtually identical to the presumption found unconstitutional in *LaFleur*, and emphasized that:

> The Fourteenth Amendment requires that unemployment compensation boards no less than school boards must achieve legitimate state ends through more individualized needs when *basic human liberties are at stake*.

*Id.* at 46, 96 S.Ct. at 251 (emphasis added).[18]

Since its decision in *Turner*, the Court has not used the irrebuttable presumption doctrine, although in some cases application of that doctrine might have been appropriate. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473 (1977); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882 (1976); *Massachusetts Board of Retirement v. Murgia; Vance v. Bradley*.

---

[18] Our court, in unemployment compensation cases, has not invoked the irrebuttable presumption doctrine. Instead, we have applied the traditional equal protection test. *See, e.g., Wallace v. Unemployment Compensation Board of Review*, 38 Pa. Commonwealth Ct. 342, 347, 393 A.2d 43, 45-46 (1978), where we said:

> [I]n the context of an economics benefits statute such as in Unemployment Compensation Act, which does not involve a fundamental right, the classification established by the statute which, as here, is not inherently suspect will pass muster under the Equal Protection Clause if it bears *some* rational relationship to the legitimate purpose of the legislation [citation omitted]. The same level of scrutiny is applied in the due process analysis so that where no fundamental right is involved, the presence of *some* rational justification in the Act's legislative purpose will suffice to protect a statutorily created conclusive presumption from effective constitutional attack. Weinberger v. Salfi [citation omitted].

In *Vance,* the Court held that Congress did not violate the equal protection clause by requiring federal employees covered by the foreign service retirement and disability system to retire at age 60, and applied the rational basis test without applying the irrebuttable presumption doctrine, saying:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

440 U.S. at 97, 99 S.Ct. at 942-43.

Recognizing the Supreme Court's determination not to apply the irrebuttable presumption doctrine since its decision in *Turner,* several other courts have declined to apply that doctrine as well. The United States Court of Appeals for the Seventh Circuit concluded that the irrebuttable presumption analysis has been tacitly abandoned by the Supreme Court. *Trafelet v. Thompson,* 594 F.2d 623, 629-30 (7th Cir.), *cert. denied* 444 U.S. 906, 100 S.Ct. 219 (1979). The United States Court of Appeals for the Second Circuit has deemed the doctrine merged into the equal protection clause, except with respect to fundamental interests or suspect classifications. *See Johnson v. Lafkowitz,* 566 F.2d 866, 869 (2d Cir. 1977). Other courts have uniformly treated the doctrine of irrebuttable presumption as coextensive with the equal protection clause. *See, e.g., Malmed v. Thornburgh,* 621 F.2d 565, 576 (3d Cir. 1980); *Fairfax Hospital Association*

*v. Califano,* 585 F.2d 602, 608-610 (4th Cir. 1978); *West v. Brown,* 558 F.2d 757, 760 (5th Cir. 1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493 (1978); *de Laurier v. San Diego Unified School District,* 588 F.2d 674, 681-684 and n. 16 (9th Cir. 1978); *Martin v. Harrah Independent School District,* 579 F.2d 1192, 1197-1199 (10th Cir. 1978).[19]

Given this line of cases, we see no reason to deviate from traditional equal protection and due process analysis even where one has constitutionally challenged a statutory presumption.[20] Having concluded that the classification adopted by the department is not suspect, does not impair fundamental rights,[21] and is rationally

---

[19] *But see Gurmankin v. Costanzo,* 556 F.2d 184 (3d Cir. 1977) (refusal by school district to permit blind person to take teacher's examination violated due process by subjecting her to irrebuttable presumption that her blindness made her incompetent to teach sighted students) (distinguished in *Malmed v. Thornburgh,* as involving a policy which was not rationally related to the legitimate state goal of assuring teacher competence).

[20] In ascertaining whether the irrebuttable presumption doctrine involves the equal protection clause or the due process clause of the Fourteenth Amendment, Professors Nowak, Rotunda and Young, in their *Handbook on Constitutional Law,* (1978) at p. 497, following an examination of Supreme Court cases applying that doctrine, concluded that:

> It now seems readily apparent that these cases actually rest on an equal protection rationale, for the objectionable portion of each law was the way in which it classified individuals. It was arbitrary classification ... that was the impermissible basis of these laws. In none of the cases would a "process" have saved the law because the procedure would only have determined whether an individual fitted into one of these arbitrary classifications.

[21] *Accord, Brletic v. Municipality of Monroeville,* 64 Pa. Commonwealth Ct. 431, 440 A.2d 686 (1982), where this court held that an irrebuttable presumption analysis was not appropriate in resolving the constitutionality of a municipality's weight limit involving applicants for the police department.

related to a legitimate state purpose,[22] and therefore satisfies the requirements of equal protection, we cannot find it unconstitutional as creating an irrebuttable presumption.

Accordingly, we reverse the order of the court of common pleas.

ORDER

Now, June 30, 1983, the order of the Court of Common Pleas of Bradford County, No. 80-7728, dated July 17, 1981, is reversed; the Department of Transportation's suspension of the bus driver's license of Glenn E. Slater is reinstated.

---

[22] Cf. *Division 85, Amalgamated Transit Union v. Port Authority of Allegheny County*, 62 Pa. Commonwealth Ct. 528, 437 A.2d 105 (1981) (court said arbitrator's determination that management decision not to hire new drivers with diabetes mellitus was not unreasonable considering the admitted safety risk presented by the possibility of insulin shock).